Nos. 79,323
79,324
79,325
79,327
79,328
79,475
79,535
79,733
79,744
79,859

CHARLES POOL, *et al., Appellants,* v. DAVID R. MCKUNE, Warden and CHARLES E. SIMMONS, Secretary of Corrections, *Appellees.*
(987 P.2d 1073)

Opinion filed July 16, 1999.

*Charles J. Cavenee*, of Lansing, argued the cause and was on the briefs for appellants.

*Timothy G. Madden*, of Kansas Department of Corrections, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by.

DAVIS, J.: The petitioners are convicted sex offenders serving time at the Lansing Correctional Facility (LCF). They appeal from a district court decision holding that plethysmograph testing as a component of the Sexual Abuse Treatment Program (SATP) did not violate their constitutional rights under the Fourth or Fifth Amendments to the United States Constitution. All cases involving these questions are consolidated for purposes of this appeal. We dismiss in part and affirm in part.

LCF administrators determine which inmates must participate in the SATP. Initially, the Reception and Diagnostic Unit (RDU) determines participation, and the LCF administrators review the determination. Occasionally, LCF administrators "modify" determinations made by the RDU. Once LCF selects an inmate to participate in the program, it notifies the inmate of the decision. If the inmate refuses to participate, LCF administrators may impose certain sanctions discussed below.

The SATP is designed as an 18-month program with three phases. The first phase lasts approximately 3 months and consists of evaluation, assessment, and treatment. Treatment involves group therapy sessions with a group leader and other sex offenders. Participants are expected to accept responsibility for the offending behavior and develop empathy for their victims. Program administrators ask participants to complete an "Admission of Responsibility" form in which they must detail their offending behavior. Polygraph testing is used to evaluate whether a participant has been forthcoming in sharing past offenses with his therapist and his therapy group. SATP administrators also subject participants to plethysmograph testing during this first phase as a means of identifying deviant sexual behavior cycles.

The second phase of the SATP lasts approximately 12 months and consists of intensive therapy. Participants are videotaped while in group therapy. Participants complete a variety of projects including writing a general autobiography and a "sexual" autobiography, listing past partners, and describing experiences. Inmates are asked to identify and discuss their deviant cycles. As part of this phase, inmates keep a journal.

The final phase consists of transitional and aftercare planning over 3 months. Participants must demonstrate genuine remorse for their offenses and release treatment information for parole planning and aftercare. Participants agree to and undergo follow-up polygraph and plethysmograph testing.

During the program inmate participants are asked to sign a variety of release forms relating to different aspects including polygraph examinations, plethysmograph testing, videotaping of group therapy sessions, and distribution of treatment information. If the inmate agrees to participate but refuses to complete any part of the program, the inmate fails the SATP.

Kansas Department of Corrections Internal Management Policies and Procedures (IMPP) Rule 11-101 (1998) and LCF General Order 19,103 establish the sanctions imposed for refusing to enter or failing to complete the SATP. IMPP 11-101 implements a statewide incentive level system which ties inmate privileges to participation in programs and good behavior. LCF General Order 19,103

states that inmates who decline program assignments shall be immediately classified as "unassigned for cause" and dropped to Level 1, the lowest incentive level. Inmates unassigned for cause may be subject to reduction of canteen privileges, moved to the LCF maximum security facility, refused employment within the facility, and denied incentive pay. In certain circumstances, good time credits may be withheld for refusal to participate in the SATP.

## PLETHYSMOGRAPHY

A plethysmograph is an electronic testing device used to measure and record male physiological responses to certain sexual situations. The testing involves a metal band placed around the inmate's penis. The inmate listens to audiotapes of various sexual scenarios. Wires running from the metal band sense changes in penis circumference and record the changes in graph form as the inmate listens to the tapes. A lab technician also takes a skin response reading from sensors attached to the inmate's fingers.

The testing procedure requires the inmate to measure the circumference of his penis in a private restroom by marking a piece of paper wrapped around the flaccid shaft. The lab technician uses this measurement to determine the size of the metal band and provides instruction on how to place the metal band. The inmate places the gauge on himself.

The testing is conducted in a private room with only one door. The inmate is seated in a recliner behind partitions; the technician remains in another room throughout the process. The participant wears a headset in order to communicate with the technician. At the very least, the inmate must pull down his pants and undergarments as far as his upper knees to ensure proper placement of the gauge.

The participant listens to 21 audiotapes of various sexual situations involving other people of different ages and sexes. The participant presses a "self report" button once or twice in answer to certain commands given by the technician through the headset. The button ensures the participant's attention and allows the participant to answer questions about whether the particular scenario involves consensual or nonconsensual activity.

Plethysmography is used to identify sexual deviant cycles that may or may not be within the grasp of the inmate by detecting penile arousal patterns and other physiological changes occurring in response to the audiotape. Lab technicians usually administer the plethysmograph test twice during the SATP; once during the beginning of the first phase, and once near the end of the final phase. Plethysmograph test results are kept in separate files away from the participants' general treatment files. However, the files are available for inspection by prison personnel. Test results are also shared with and discussed among program administrators and may be discussed in group therapy sessions.

## PROCEDURAL HISTORY

Each petitioner is a convicted sex offender. Each filed a virtually identical petition for writ of habeas corpus with the district court alleging coercion to participate in the SATP and loss of privileges for refusal to participate. Each alleged that the SATP violated his constitutional rights under the Fourth and Fifth Amendments to the United States Constitution. We dismissed all Fifth Amendment claims because they have been resolved by our decisions in *Bankes v. Simmons*, 265 Kan. 341, 963 P.2d 412 (1998); *Stansbury v. Hannigan*, 265 Kan. 404, 960 P.2d 227, *cert. denied* 142 L. Ed. 2d 567 (1998); and *Vinson v. McKune*, 265 Kan. 422, 960 P.2d 222 (1998). We therefore deal only with petitioners' constitutional claims under the Fourth Amendment to the United States Constitution.

## STANDING

Although it is not entirely clear, either from the record or from the petitioners' written response to questions posed by the court during oral argument, that all petitioners have suffered sanctions for refusal to participate in the SATP, at least three petitioners fall into this category. Given the nature of the sanctions imposed for failure to participate, it is clear that sufficient compulsion for participation exists to provide standing for the affected petitioners to raise their constitutional claims. Thus, the issues raised by this consolidated appeal concerning the right of privacy under the Fourth Amendment are ripe for resolution.

## ANALYSIS

Convicted prisoners do not forfeit all constitutional protections because of their conviction and confinement. *Bell v. Wolfish,* 441 U.S. 520, 545, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). For example, with some restrictions, "prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments" as well as protection "against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment." They may also "claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law." *Bell v. Wolfish,* 441 U.S. at 545.

However, lawful incarceration often results in withdrawal or limitation of many privileges and rights that would otherwise be accorded any citizen.

" 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights [of prisoners], a retraction justified by the considerations underlying our penal system.' *Price v. Johnston,* 334 U.S. 266, 285, 92 L. Ed. 1356, 68 S. Ct. 1049 (1948). The limitations on the exercise of [federal] constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, *rehabilitation of prisoners,* and institutional security. *Pell v. Procunier,* 417 U.S. [817,] 822-23[, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1994)]; *Procunier v. Martinez,* 416 U.S. 396, 412, [40 L. Ed. 2d 224, 94 S. Ct. 1800] (1974)." (Emphasis added.) *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 96 L. Ed. 2d 282, 107 S. Ct. 2400 (1987).

An inmate retains no right of privacy under the Fourth Amendment in the cell he or she occupies. However, inmates generally retain a privacy interest in the integrity of their own person. See *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir. 1995). Courts have recognized that the Fourth Amendment right to privacy is implicated in several situations where bodily integrity is compromised. See *Hayes,* 70 F.3d at 1146 (body searches viewed or conducted by guards of opposite sex implicates right to privacy); *Dunn v. White,* 880 F.2d 1188, 1193 (10th Cir. 1989), *cert. denied* 493 U.S. 1059 (1990) (collecting a blood sample for prison AIDS test is a physical intrusion which infringes upon the inmate's expectation of privacy but did not violate prisoner's Fourth Amendment rights; ensuing analysis of blood is further intrusion); and *Cumbey*

*v. Meachum,* 684 F.2d 712, 714 (10th Cir. 1982) (strip searches viewed by guards of opposite sex implicates right to privacy).

Plethysmograph testing in this case requires that the inmate perform activities of an extremely private nature. The intrusion involves a personal and private part of the body; it intrudes upon the bodily integrity of the participant. Recently, a Kansas federal court addressing the same issue we now face concluded that plethysmograph testing implicated the inmate's constitutional right to privacy under the Fourth Amendment. *Lile v. McKune,* 24 F. Supp. 2d 1152, 1162 (D. Kan. 1998). In so holding, the court reasoned that "plethysmograph testing requires the physical involvement of arguably the most private part of the inmate's body, for the purpose of recording and monitoring the physiological disclosure of sensitive and revealing information about the inmate's sexual response." 24 F. Supp. 2d at 1162. We agree and hold that plethysmograph testing implicates the participants' right to privacy under the Fourth Amendment in at least two respects: (1) the search or intrusion itself and (2) the subsequent analysis, documentation, and discussion of the test results. *Cf. Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 658, 132 L. Ed. 2d 564, 115 S. Ct. 2386 (1995) (a privacy-invasive aspect of urinalysis is the information it discloses about the subject's body); *Dunn,* 880 F.2d at 1193.

The question of whether the intrusion and the information disclosed in this case is a violation of the inmates' constitutional right of privacy under the Fourth Amendment depends upon whether under all the circumstances, the search is reasonable. As pointed out by the Supreme Court in *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 619, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989), not all searches and seizures under the Fourth Amendment are proscribed:

"[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. *United States v. Sharpe,* 470 U.S. 675, 682[, 84 L. Ed. 2d 605, 105 S. Ct. 1568] (1985); *Schmerber v. California,* 384 U.S. [757, 768, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966)]. What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' *United States v. Montoya de Hernandez,* 473 U.S. 531, 537[, 87 L. Ed. 2d 381, 105 S. Ct. 3304] (1985). Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth

Amendment interests against its promotion of legitimate governmental interests.' *Delaware v. Prouse*, 440 U.S. [648, 654, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979)]; *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976)."

The Court has recognized that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell*, 441 U.S. at 559. Thus, courts have sought to balance on a case-by-case basis the need for the particular action against the invasion of personal rights the action entails. In performing such a balancing test, courts are to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559.

One of the most significant considerations in resolving the question before us is the standard to be applied in our review of the claimed constitutional violation. The standard of review is clearly delineated by the Court in *Turner v. Safley*, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). The Court formulated a standard of review for prisoners' constitutional claims that was responsive both to the "policy of judicial restraint," 482 U.S. at 85, regarding prisoner complaints and to the protection of constitutional rights. The Court adopted a rational basis test: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89.

In determining the reasonableness of a prison regulation, several factors are relevant: (1) whether there is a valid, rational connection between the prison regulation or practice and a legitimate governmental interest; (2) whether the regulation or practice allows inmates an alternative means of exercising the subject constitutional right; (3) the impact of accommodation of the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice. [*Turner*, 482 U.S. at 89-90.]" *Hayes*, 70 F.3d at 1146-47.

The heart of the *Turner* reasonableness test demands that there be a rational connection between prison action and the legitimate governmental interest put forward to justify it. Thus, the action

cannot be sustained where the logical connection between it and the asserted goal is so remote as to render the policy arbitrary or irrational. 482 U.S. at 89-90. The analysis of a prisoner's constitutional privacy claim in this case centers on this first factor: Whether a valid and rational connection exists between the regulation and the penological interest offered to justify the regulation.

It is important to point out the reason given by the Court for the adoption of the rational basis test instead of a strict scrutiny test which is generally applied in cases involving a claimed deprivation of a constitutional right. According wide-ranging deference to prison administrators in the adoption and execution of policies relating to prison administration, the Court said:

"In our view, such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoners' Union*, 433 U.S. [119, 128, 53 L. Ed. 2d 629, 97 S. Ct. 2532 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.' *Procunier v. Martinez*, 416 U.S. at 407." 482 U.S. at 89.

Thus, our evaluation of the constitutional claims in this appeal must accord great deference to prison administrators in their adoption and execution of policies and practices intended to advance "valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. at 348. An inmate's exercise of constitutional rights must exhibit due regard for the concerns of prison administrators. *Hayes v. Marriott*, 70 F.3d at 1146.

In this case, the privacy accorded to the inmate while participating in the test minimizes the scope of the physical intrusion. The test involves no physical harm to the inmate. He places the band on himself in private and is never viewed by others during the test. Under such circumstances and the additional circum-

stances set forth above we conclude that neither the scope of the intrusion, nor the manner in which the test is conducted, nor the place in which it is conducted outweigh the penological interest in rehabilitating sex offenders.

The evidence of record also demonstrates that there is a rational connection between plethysmograph testing and the legitimate penological goal of rehabilitation. While program administrators acknowledge that plethysmography is not an exact science and one without much of a track record, they testified that plethysmography is one way to determine arousal patterns and identify deviant sexual behavior cycles. Relying on inmates to self-report behavior patterns is futile because inmates are often unaware of these patterns or are in complete denial and unwilling to admit them. Administrators further testified that other inmate sex offender programs and outpatient mental health centers treating private citizens use plethysmograph testing. Even though the science of plethysmography is questionable, prison administrators must be given great deference in inmate rehabilitation. See *O'Lone v. Estate of Shabazz,* 482 U.S. at 349; *Hayes v. Marriott,* 70 F.3d at 1146; *Lile v. McKune,* 24 F. Supp. 2d at 1163.

Application of the remaining three *Turner* factors do not weigh in favor of petitioners. While it may be concluded that petitioners have no alternative means of exercising their right to be free of plethysmograph testing, we have concluded that the intrusion does not outweigh the penological interest in rehabilitating sex offenders. Accommodating the asserted right frustrates the goal of rehabilitation. Accommodation would, however, have no measurable impact on guards, other inmates, and the allocation of prison resources. Finally, it is clear from the record that there is no ready alternative to plethysmograph testing. However, we conclude that the testing in this case satisfies the rational basis test in that there is a rational connection between plethysmograph testing and its purpose of rehabilitating the participants in the SATP. We therefore conclude that plethysmograph testing, including personal information disclosed and disseminated as a component of the SATP, does not violate the petitioners' Fourth Amendment right to privacy.

The petitioners also argue that plethysmograph testing violates their right to refuse medical or psychological treatment. The United States Supreme Court has recognized a due process right to be free from forced administration of psychotropic drugs, *Washington v. Harper*, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990); bodily restraint, *Youngberg v. Romeo*, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982); transfer to a mental hospital, *Vitek v. Jones*, 445 U.S. 480, 495-96, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980); or medical treatment, *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990).

However, the above cases provide little support for petitioners' position. Plethysmograph testing, as outlined in this opinion, does not involve forced administration of drugs or other bodily intrusions or restraints. See *Lile*, 24 F. Supp. 2d at 1161-62; *Bollig v. Fiedler*, 863 F. Supp. 841, 849 (E.D. Wis. 1994); *State ex rel. Morrow v. LaFleur*, 590 N.W.2d 787 (Minn. 1999) (inmate does not have a fundamental right to refuse treatment through a sex offender program). Testing in this case is part of a rehabilitation effort rather than a medical treatment suggested in the above cases. Moreover, it is clear under the *Turner* analysis that the legitimate penological goal of rehabilitation outweighs any such claimed liberty interest.

Affirmed.