(76 P.3d 1048)
No. 89,759

JERRY RICE, *et al., Appellants*, v. STATE OF KANSAS, *et al.,*
*Appellees.*

Opinion filed September 19, 2003.

*Bruce Plenk,* of Lawrence, for appellants.

*Kenneth R. Smith,* special assistant attorney general, for appellees.

Before BEIER, P.J., JOHNSON, J., and WAHL, S.J.

BEIER, J.: Petitioners, inmates at the Lansing Correctional Facility (LCF), challenge respondents' prohibition of their receipt of gift subscriptions to newspapers and magazines as a violation of their First Amendment rights. The district court upheld the respondents' practice, finding it reasonably related to a valid penological interest of the Kansas Department of Corrections (DOC).

The parties stipulate that petitioners' family members and friends have paid for magazine or newspaper subscriptions in petitioners' names. Petitioners have not paid any portion of the costs of the subscriptions from their inmate accounts, and they have not presented special purchase orders (SPOs) to the LCF business office in connection with the subscriptions. These magazines or newspapers have been sent to LCF directly by the publishing companies. LCF has intercepted the periodicals before they reached petitioners; petitioners have not received individual "notice of seizure" forms in connection with these interceptions.

After exhausting their administrative remedies, petitioners filed a pro se action under K.S.A. 2002 Supp. 60-1501, seeking an injunction to prevent respondents from intercepting the periodicals. To justify their actions, respondents have relied upon K.A.R. 44-12-601 and Internal Management Policy and Procedure (IMPP) 11-101.

K.A.R. 44-12-601(q)(1) provides that "[a]ll books, newspapers and periodicals shall be purchased through special purchase orders" and "[o]nly books, newspapers, or periodicals received directly from a publisher or a vendor shall be accepted." Special purchase orders facilitate payment from an inmate's prison ac-

count. K.A.R. 44-12-601(b) provides that inmates must comply with all mail procedures established by order of the warden and that "circumventing or attempting to circumvent mail procedures or restrictions by any means" is prohibited.

IMPP 11-101 sets forth a comprehensive system of "Earnable Privileges" and "Incentive Levels" under which inmates can progress to increasing benefits by avoiding disciplinary actions and criminal behavior and by participating in programs or work assignments. "Earnable Privileges" include "[u]se of outside funds."

Section VI of IMPP 11-101 speaks to "Limitation[s] on Use of Incoming and Outgoing Funds":

"A. For inmates assigned to Intake Level, outgoing funds shall be limited to fees for legal services, and for inmates on Level I, no outgoing funds may be used to purchase books . . . or . . . newspaper or magazine subscriptions.

"B. Except as provided below, there shall be a $30.00 limit on outgoing funds.
  1. Inmates may exceed the $30.00 limit, if necessary, for the purchase [of] a primary religious text if the cost of the text is greater than that amount.
  2. The $30.00 limit shall not apply to payments to the following:
  a. The court for verified restitution and/or court costs;
  b. Verified fees payable to an attorney for legal services;
  c. Verified child support payments;
  d. Specialized fees, expenses as authorized by the warden or designee; and,
    (1) As possible, approval for such payments shall be payable to the vendor or service provider only.
  e. Purchases of approved handicraft materials/supplies.

"C. Upon recommendation of the unit team and approval of the warden or designee, offenders assigned to private industry (minimum wage) or those receive government benefits may be authorized, on an individual basis, to send out funds in excess of $30.00 per pay period limit.

"D. Inmates on Incentive Level II or Incentive Level III are authorized to maintain one (1) newspaper subscription, and may exceed the $30.00 limit for outgoing funds in order to do so.
  1. The expense for the newspaper subscription shall be included in the $30.00 limit.
  2. Such an exception shall be allowed no more than one (1) time per every three (3)-month period."

The DOC's stated goal in adopting IMPP 11-101 is to "provide an effective means of managing the offender population and re-

inforcing constructive behavioral changes in offenders." IMPP 11-101. In other words, the policy is designed to promote prison security and inmate rehabilitation. Respondents assert that it also enables the prison administration to monitor inmates' accounts, to curtail dealing and trading among inmates, and to ensure that inmates meet payment obligations such as restitution before spending their money on personal items.

The record on appeal also contains two DOC interdepartmental memoranda to all inmates regarding receipt of periodicals. The first memo, dated February 7, 2001, stated in pertinent part:

"**Effective March 19, 2001**
"**Periodicals**
"In order to receive a magazine or newspaper,
   1. You must purchase the periodical through the Business Office. The mailroom will keep a list from SPO's of all inmates who have made purchases through the Business Office. When you send your SPO to the business office **be certain the name of the periodical is on the SPO.** Otherwise, you will not be on the list of inmates who have purchased periodicals, and your magazine or newspaper will not be processed. **Also, you must complete the attached form and include it with your SPO when purchasing a periodical.**
   2. The magazine or newspaper must have a label with your name on it.
"All periodicals received after March 19 that do not comply with these requirements will be sent to the visiting rooms (if appropriate) or destroyed."

The second memo, dated March 2, 2001, stated in pertinent part:

"[T]he facility is going to permit each inmate on privilege/incentive levels II and III a one-time only grandfathering opportunity for one year. This means if you are currently receiving periodicals that you did not purchase through the business office, *you may select one, and continue to receive it for <u>no more</u> than 12 months from today's date. . . .*
. . . .

"Please be assured we have reviewed this matter carefully. We appreciate the concerns some of you have raised about the First and Fourteenth Amendment rights you have to reading materials. However, it is important to realize that the department and facility have an overriding interest in the implementation of an effective privileges and incentives program, and these limits on periodicals are crucial to that program. There is no absolute prohibition on periodicals, so we believe this is a proper balancing of everyone's legal interests and objectives.

"Concerning free publications, please be advised if the publication is received **other than by bulk mail**, and you have advised us in advance you are receiving this publication, with verification that it is free, you will continue to receive the periodical."

A third DOC interdepartmental memorandum is quoted in the district court's Memorandum Decision. According to the district court, it was dated February 20, 2001, thus falling chronologically between the two memoranda quoted above. The February 20 memorandum read in pertinent part:

"Policy requires that all periodicals be purchased through the business office by an SPO. It does not allow for persons outside of the facility to purchase and send in subscriptions to periodicals. If you are on Incentive Level II or III you may exceed the $30 limit once every three months for newspapers only. Beyond this, your periodical purchases must be within the $30 per month limit.

"This means if you are currently receiving subscriptions that you did not pay for through the business office, you need to divert them, because after the effective date stated in the memo those will not be sent in. It also means in the future only those periodicals purchased by SPO, clearly identified as periodicals through the periodical cover sheet and on the SPO, will be processed through the mailroom.
. . . .
"This policy is not new, and has been in place for some time. My recent memo simply clarified what part of mailroom has in enforcing the policy. Also, since it appeared some inmates were not following the policy, we gave reasonable notice of the fact that this needs to be corrected.

"If you are receiving a free religious periodical, so long as it is not coming in by bulk mail, we will continue to process that periodical. Any item that is free and comes in by bulk mail will not be sent in, because departmental policy disallows processing bulk mail items."

William Cummings, LCF's risk manager and the DOC Secretary's designee for review of inmate grievances, said the prison was not concerned about free publications because they had no barter value among the inmates. Inmates are permitted to receive money for deposit in to their prison accounts from third parties outside of the prison.

The prison offers two library periods for inmates each day. Six inmates can use the library during any given period. Magazines and newspapers cannot be checked out. In response to inmate complaints, library visitation times were adjusted; a mobile library was created; and inmates were encouraged to request specific

publications be added to the library's holdings. The deputy warden stated that a review of actual library use revealed inmate sign-up sheets often were not full. An inmate is permitted to have up to 10 magazines and 10 newspapers of his own in his cell at one time.

Given the library alternative, the ability of Level II and III inmates to spend up to $30 per month to purchase periodicals, the possibility of spending more than that amount for a newspaper every 3 months, and the grandfathering of one gift publication for up to 12 months, the respondents argued that petitioners asserted a "quite narrow" interest: "the 'right' to receive magazines and newspapers of the inmate's choice without permitting fiscal transparency."

The district judge recognized the First Amendment to the United States Constitution generally protected petitioners' rights to receive periodicals. See *Thornburgh v. Abbott*, 490 U.S. 401, 408, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989) (legitimate First Amendment interest in communication between publishers and inmates "who, through subscription willingly seek [the publishers'] point of view"). Thus respondents had to demonstrate a reasonable justification for limiting the amount an inmate could spend on periodicals and the method by which he could receive them. See *Thornburgh*, 490 U.S. at 413-14.

In reviewing respondents' justification, the district judge correctly recognized that the ban on gift subscriptions must be analyzed under *Turner v. Safley*, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89.

*Turner* set forth four factors to be considered:

"(1) whether there is a valid, rational connection between the prison regulation or practice and a legitimate governmental interest; (2) whether the regulation or practice allows inmates an alternative means of exercising the subject constitutional right; (3) the impact of accommodation of the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice." *Pool v. McKune*, 267 Kan. 797, 804, 987 P.2d 1073 (1999) (quoting *Turner*, 482 U.S. at 89-90).

Our standard of review on an appeal in a K.S.A. 2002 Supp. 60-1501 case requires us to determine whether any factual findings of

the district court were supported by substantial competent evidence and, if so, whether those findings were sufficient to support the district court's conclusions of law. *Darnell v. Simmons*, 30 Kan. App. 2d 778, 780, 48 P.3d 1278 (2002). We need not concern ourselves here with the district court's findings of fact, as the governing facts were, essentially, uncontroverted. Rather, we focus on whether the district court's findings of fact adequately support its final conclusion of law, *i.e.*, that respondent's ban on gift periodicals is reasonably related to a valid penological interest.

To affirm, we must first agree with the district judge that a rational relationship exists between a prohibition on gift subscriptions for inmates and a legitimate government interest. The prohibition cannot be sustained if the logical connection between it and the asserted goal is so remote as to render the policy arbitrary or irrational. *Turner*, 482 U.S. at 89-90; see also *Shaw v. Murphy*, 532 U.S. 223, 229-30, 149 L. Ed. 2d 420, 121 S. Ct. 1475 (2001) (if rational relationship to legitimate government interest absent, regulation fails despite other factors in its favor). Furthermore, it is important to inquire whether prison regulations restricting inmates' First Amendment rights operate in a neutral fashion. *Turner*, 482 U.S. at 90.

Regarding this first *Turner* factor of a rational relationship, the district judge found respondents' policy of excluding gift subscriptions rationally related to legitimate government interests in prison security and inmate rehabilitation, as those goals were sought through IMPP 11-101. He accepted respondents' argument that, because the policy includes among its incentives an increased ability to use money on discretionary purchases such as periodical subscriptions, permitting gift subscriptions would undercut the policy's goals by allowing inmates who had not earned such a privilege to circumvent the incentive system. Simply put, inmates who did not want to go to the trouble to earn the ability to obtain periodicals could misbehave while their friends and relatives outside the walls supplied the reading material the inmates desired through gift subscriptions.

The district judge rejected the respondents' other security argument that gift subscriptions would lead to strong-arming and

shakedowns among inmates, *i.e.*, one inmate threatening another or another's family member with harm unless "gift" periodicals started arriving in the threat maker's name. The court reasoned that such problems were just as likely to occur when the subject of the strong-arming or shakedown was cash; yet DOC and LCF permits persons outside the prison to send money for deposit in inmate accounts.

The district judge also found the regulation and policy neutral, mentioned what he saw as the ban's laudable furtherance of contraband control, and acknowledged that his judgment for respondents in this case contradicted his decision in an earlier, similar case.

On appeal, petitioners urge us to follow the lead of the United States Court of Appeals for the Ninth Circuit in *Crofton v. Roe*, 170 F.3d 957 (9th Cir. 1999).

In that case, the Ninth Circuit panel endorsed the district court's earlier rejection of several government purposes advanced as being legitimate and rationally related to a blanket ban on prisoners' receipt of gift books and periodicals. The panel wrote:

"The district court cogently explained why it found each of the interests allegedly furthered by the policy to be unavailing. First, the court found that prohibiting gift publications does not reasonably relate to legitimate concerns about fire hazards and storage space, because other prison regulations limit the number of books an inmate may possess. Second, the court found that the regulation does not reasonably relate to the valid penological interest in the prevention of contraband, because the prison offered 'no rational distinction between the risk of contraband if an inmate orders a publication directly from the publisher or if an inmate's family member orders a publication directly from the publisher.' Third, the court rejected the state's position that a complete prohibition on gift publications is necessary to ensure the efficiency of prison operations, because the prison could instead regulate the number of gift publications that inmates could receive. The court also observed the prison had placed no limit on the number of publications an inmate could order so long as storage limitations were not exceeded. Finally, the court rejected the state's position that the regulation reasonably relates to the legitimate penological concern of strong-arming. The court noted that the state offered absolutely no specific facts or explanation to support its argument. Moreover, the court found the state's argument weakened by its allowance of family and friends of inmates to send money, a practice which also raises strong-arming concerns. The ability of persons on the inmate's visiting

list to send gift packages and money, but not constitutionally protected publications, also troubled the court." 170 F.3d at 960.

The Ninth Circuit proceeded to uphold the district court's decision that defendants had offered no reasonable justification for the ban; they had not described any particular risk created by prisoners receiving gift books and periodicals; and they had not shown any rational relationship between the ban and a legitimate penological objective of eliminating such a risk. 170 F.3d at 960-61.

As one would expect, respondents discount the persuasive power of *Crofton*. To them, the existence and goals behind IMPP 11-101 make all the difference: *Crofton* is distinguishable because the Ninth Circuit panel did not examine a ban on gift publications in the larger context of a comprehensive system of incentives for good behavior, such as that set up by IMPP 11-101.

We agree that the *Crofton* case does not assist us with our analysis of respondents' arguments based on IMPP 11-101. Yet it does assist us, and we elect to follow its rationale where it is *not* distinct, *i.e.*, on the issue of potential strong-arming or shakedowns. The Oregon authorities whose gift publication ban was under scrutiny in *Crofton* allowed inmates to receive money from certain persons outside the system; respondents also permit gifts of cash to be deposited into inmates' accounts. We agree with both the *Crofton* district court and appellate court panel and with the district judge in this case that strong-arming and shakedowns are just as likely, if not more likely, to occur over cash than over gift publications. Thus, this particular security justification for the Kansas ban on gift periodicals does not pass constitutional muster.

That being said, we recognize that the DOC "has the right as well as the statutory obligation to maintain good government within the Kansas corrections system," including the adoption of IMPP 11-101 to provide for incentives to encourage good behavior. See *Vinson v. McKune*, 265 Kan. 422, 426, 960 P.2d 222 (1998). We do not question the DOC's authority — indeed, its mandate — to safeguard the prison and its inmate and employee populations from those who would disrupt or damage them.

We do question, however, the existence of a rational relationship between the ban on gift periodicals and this authority or mandate.

See *Collier v. Nelson*, 25 Kan. App. 2d 582, 585, 966 P.2d 1117, *rev. denied* 266 Kan. 1107 (1998) (relationship necessary). We also fail to see how a complete prohibition on gift periodicals furthers the other announced IMPP 11-101 goal of inmate rehabilitation.

If respondents wish to press the promise of access to gift periodicals into the service of their security and rehabilitation goals, it would be rational to *permit* such access under IMPP 11-101 *but only* as one of the rewards for good behavior and attainment of a higher "level." It is not rational to eliminate *all* access to *all* gift periodicals for *all* inmates, be they model prisoners or habitual disciplinary rule violators. A blanket ban is too broad a restriction on the First Amendment rights of the well behaved and fails to restrict the ill behaved in any manner designed to promote a change in their ways.

Allowing gift periodicals for inmates who earn the privilege of receiving them also would not undermine respondents' legitimate interest in limiting the introduction of contraband into the prison. Again, *Crofton* is good authority supporting petitioners. Respondents, like the Oregon officials involved in *Crofton*, offered " 'no rational distinction between the risk of contraband if an inmate orders a publication directly from the publisher or if an inmate's family member orders a publication directly from the publisher.' " *Crofton*, 170 F.3d at 960.

We also do not accept respondents' argument that allowing access to gift periodicals for inmates would necessarily interfere with a legitimate government interest in monitoring the source of funds and property directed to inmates and the disbursement or distribution of funds and property by them. The record contains no evidence of any reason that respondents cannot develop an alternate SPO to cover gift periodicals; such a form could require the ordering friend or family member of the inmate to state the cost of the periodical, the source and manner of payment, and any other data needed for the prison business office and mailroom to perform their monitoring functions.

Because we conclude that respondents' ban on gift periodicals bears no "valid, rational connection to the legitimate governmental interest put forward to justify it," *Turner*, 482 U.S. at 89, we need

not address the further question of whether the ban also qualified as neutral. We observe only that *Thornburgh* reinterpreted the concept of content neutrality discussed in *Turner* such that the ban may have satisfied this criterion despite its apparent differential treatment of religious publications. See *Thornburgh*, 490 U.S. at 415.

We also need not address the three remaining factors of *Turner*. Compliance with the first factor is indispensable as a matter of law to a holding that the ban is reasonably related to legitimate penological interests. We hold that the "logical connection between the regulation and the asserted goal[s]" of security and rehabilitation under IMPP 11-101 "is so remote as to render the [ban] arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

Reversed.

WAHL, J.: I respectfully dissent from the decision rendered by my colleagues. In the first instance, there has been a disregard for the very basic premise stated in *Turner v. Safley*, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987), when considering a prison regulation:

" '[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [Citation omitted.] . . . '[T]he problems of prison in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree.' [Citation omitted.] Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislature and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." 482 U.S. at 84-85.

The *Turner* court rejected a strict analysis of the regulation, holding:

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest. In our view, such a standard is necessary if 'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.' [Citation omitted.] Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate

security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." 482 U.S. at 89.

The *Turner* court went on to establish factors to be taken into account when considering whether a regulation is reasonable. These factors were succinctly stated in *Pool v. McKune*, 267 Kan. 797, 804, 987 P.2d 1073 (1999), when quoting *Turner*, 482 U.S. at 89-90. I shall briefly address each factor in relation to this case.

### *Is there a valid, rational connection between the prison regulation or practice and a legitimate governmental interest?*

Petitioners argue the regulation restricts their First Amendment rights while failing to advance the correctional goals of internal order or discipline. They contend it is not related to a legitimate penological interest and cannot be constitutionally upheld. IMPP 11-101 is an internal management policy and procedure in which inmates can earn certain privileges and incentives. According to the policy, the Kansas Department of Corrections (DOC) "shall implement a comprehensive system of earnable offender privileges which will provide an effective means of managing the offender population and reinforcing constructive behavioral changes in offenders." *Vinson v. McKune*, 265 Kan. 422, 423, 960 P.2d 222 (1998). Under this policy, inmates can earn various privileges.

The DOC "has the right as well as the statutory obligation to maintain good government within the Kansas corrections system. To this end, the department may, as it has done in this case, provide for security, privileges, and incentives to accomplish such an end . . . ." 265 Kan. at 426. A key component of Kansas' system is requiring inmates to earn prison privileges which, in turn, contributes to the security, rehabilitation, and efficient prison administration.

The majority draws extensively from *Crofton v. Roe*, 170 F.3d 957 (9th Cir. 1999), wherein the court did not uphold a blanket ban on gift subscriptions in an incentive program context. In *Vinson*, the Kansas Supreme Court affirmed the use of IMPP 11-101

to maintain good government in the prison. 265 Kan. at 426, 430. As gift subscriptions would circumvent the incentive program, the regulation against them is rationally related to the penological purposes of rehabilitation, security, and order in the prison.

*Do inmates have an alternative means of exercising their First Amendment right to the free flow of information?*

When other avenues are available for the exercise of the asserted right, courts should be particularly conscious of the " 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " *Turner*, 482 U.S. at 90 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 41 L. Ed. 2d 495, 94 S. Ct. 2800 [1974]).

Petitioners argue they have no alternative means of exercising their First Amendment right to the free flow of information. They say they are denied access to magazines if their subscriptions cost more than $30 per month and the only way they can obtain these magazines is through gift subscriptions. They also contend access to the prison library and the supply of magazines is limited, making it an unsatisfactory alternative to gift subscriptions.

Financial limitations do exist when inmates attempt to purchase magazine subscriptions; however, inmates do have the opportunity to petition the warden for an exemption to their spending limit. Also, substantial evidence was presented to refute the complaints about the prison library as an alternative means of accessing this information.

Library visitation times were adjusted to "the most user friendly time," a mobile library was created, and inmates were encouraged to request specific publications be added to the library. An in-house review of the actual use of the libraries revealed that often the sign-up sheets for library use were not full. Substantial evidence supports the district court's finding that the prison library was a legitimate alternative method consistent with the goal of rehabilitation. It is not our function to reweigh evidence. See *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 12, 61 P.3d 68 (2002).

*What is the impact of the accommodation on guards, other inmates, and prison resources?*

It would be a rare change that would have no ramifications on the liberty of others or on the use of the prison's limited resources

for preserving institutional order. Courts should be particularly deferential to the informed discretion of correction officials when accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff. *Turner*, 482 U.S. at 90.

Petitioners argue the increase in the volume of incoming mail would be minimal as the prison already receives gift subscriptions but simply fails to deliver them. It appears self-evident that the volume of periodicals would greatly increase along with the demands on prison staff to screen and deliver them if gift subscriptions are permitted.

Furthermore, petitioners' argument ignores the primary purpose of this regulation which is to encourage inmates to follow prison rules in order to receive certain benefits and furthers the penological objectives of rehabilitation and security. A change in this program certainly could have a negative ripple effect on the behavior of the inmates and the demands on prison officials.

### Do ready alternatives exist to the regulations?

Prison officials do not have to eliminate every conceivable alternative method of accommodating the petitioners' constitutional complaint, but if an inmate can suggest an alternative that accommodates the prisoners' right at minimal cost to valid penological interests, the officials should consider it. Petitioners contend an easy alternative is to incorporate gift subscriptions into the existing prison mail policy. They suggest having the inmates fill out a special purchase order (SPO) for the gift subscriptions or doing away with the SPO system and simply monitoring incoming publications or allowing inmates access to gift subscriptions as a component of the privilege and incentive policy.

The first two suggestions clearly impede the goals of rehabilitation and security because they circumvent the prison's incentive-based program. The last suggestion to incorporate gift subscriptions into the incentive-based system would appear to be a viable option for consideration.

However, an evaluation of the constitutional claims under *Turner* must accord great deference to prison administrators in

their formulation and execution of policies and practices relating to prison administration. Such deference is necessary if prison administrators and not the courts are to make the difficult judgments concerning institutional operations. See *Pool*, 267 Kan. at 805.

An analysis under the *Turner* factors supports the district court's decision. A possible alternative may exist, but this possibility, standing alone, is not determinative of the issue. I submit that by giving due deference to the prison officials, the regulation and policy as part of the incentive-based program is reasonably related to the valid penological objectives of security and rehabilitation.

I would affirm the district court.