NOT DESIGNATED FOR PUBLICATION

No. 113,239

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SCOTT ROEDER,
*Appellant*,

v.

KANSAS DEPARTMENT OF CORRECTIONS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAN K. WILEY, judge. Opinion filed February 12, 2016. Affirmed.

*William K. Rork* and *Joseph T. Laski*, of Rork Law Office, of Topeka, for appellant.

*Sherri Price*, legal counsel/special assistant attorney general, of Lansing Correctional Facility, for appellee.

Before BRUNS, P.J., MCANANY, J., and JOHNSON, S.J.

*Per Curiam*: Scott Roeder was convicted of murdering Dr. George Tiller of Wichita. Dr. Tiller had been the medical director of Women's Health Care Services which provided abortion services in Wichita. After Roeder's conviction, the former spokesperson for Women's Health Care Services began the process of reopening the clinic. At that point, Roeder was serving his sentence at the Lansing Correctional Facility,

1

where he gave a telephone interview to pro-life activist Dave Leach. Leach was the publisher of a newsletter entitled *Prayer and Action News*.

Following Leach's telephone interview of Roeder, Leach placed the interview on YouTube. During the interview Leach asked Roeder about the reopening of Dr. Tiller's clinic. Roeder responded:

> "'I guess I should have been putting some more thought into it. But it's a little bit death defying, you know, for someone to walk back in there. I think that woman's name is [name of former clinic spokesperson] . . . and to walk in there and reopen a clinic, a murder mill, where a man was stopped, it's almost like putting a target on your back, saying, "well let's see if you can shoot me." But I have to go back to what Pastor Mike Bray said, "if 100 abortionists were shot, they would probably go out of business." I think 8 have been shot, so we got 92 to go. Maybe she'll be number nine. I don't know, but she's kind of painting a target on her[self].'"

The conversation was also recorded on the prison phone system. Andrew Lucht, a correctional specialist at Lansing, reviewed the recording and, as a result, prepared a disciplinary report charging Roeder with threatening or intimidating a person in violation of K.A.R. 44-12-306. In the hearing that followed, Roeder clarified that his statement "'a man was stopped'" was a reference to Dr. Tiller. Roeder admitted that he made the statements, but he claimed "I just didn't have intent behind the words."

The hearing officer concluded that Roeder knew the comments would be put on YouTube and that the comments could be seen by a reasonable person as an act of intimidation or a threat. The hearing officer found Roeder guilty of the disciplinary violation and imposed 45 days of segregation, 60 days of restricted privileges, and a $20 fine. Roeder appealed this decision to the Secretary of Corrections who approved the hearing officer's decision.

Roeder then filed a petition for a writ of habeas corpus. See K.S.A. 2015 Supp. 60-1501. In his petition, Roeder argued that the sanctions imposed by the prison violated his due process rights and amounted to an unconstitutional restraint of his right to free speech under the First Amendment to the United States Constitution. Roeder also claimed that his statement did not constitute a violation of K.A.R. 44-12-306.

The district court issued a writ to the Kansas Department of Corrections, and the case proceeded to an evidentiary hearing. At the hearing Roeder argued K.A.R. 44-12-306 was invalid both as applied and on its face because it was unconstitutionally vague and overbroad and infringed on his First Amendment right to free speech.

Lucht and Roeder testified at the hearing. Roeder testified that Leach had been his friend for over 20 years. "I guess you would say since he was affiliated with the Pro-Life movement I knew him from the Pro-Life movement." Roeder was aware that Leach had published a lot about his case in his *Prayer and Action News* and he had "no problem" with Leach publishing the interview. In fact, Roeder observed that when it came to Leach publishing the interview, "I think anyone in their right mind could have figured that one out."

The district court denied relief on Roeder's K.S.A. 60-1501 petition, ruling that enforcing K.A.R. 44-12-306 against Roeder did not infringe upon his First Amendment rights. The district court characterized Roeder's statement as indirect intimidation of the new clinic operator. The court reasoned:

"Roeder could have easily chosen alternative language that would not have violated the regulation. For example, he could have stated an opinion regarding the reopening of the abortion clinic without mentioning [the new clinic operator] whatsoever. He could have refrained from stating that [the new clinic operator] was 'painting a target' on herself, or

3

avoided any mention of potential violence against [the new clinic operator] whatsoever. He clearly could have refrained from stating 'we got 92 to go' which is the most threatening or intimidating of the statements made by Roeder. However, knowing that his words would be recorded and published, Roeder chose to specifically mention [the new clinic operator] in the context that she would invite violence upon herself if she opened the abortion clinic. Given Roeder's background, the purpose of his incarceration, and his actual knowledge that his statements would be recorded and widely disseminated, a reasonable person could interpret his statements as intended to intimidate [the new clinic operator]."

Roeder appeals, claiming the district court erred in denying relief on his K.S.A. 60-1501 petition.

Violations of First Amendment rights may be challenged in a habeas corpus proceeding. *Mahan v. Maschner*, 11 Kan. App. 2d 178, 179, 717 P.2d 1059 (1986). With respect to the district court's decision denying relief on Roeder's K.S.A. 60-1501 petition, we review the district court's decision to determine if its factual findings are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. We review de novo the district court's conclusions of law. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004).

Administrative regulations are presumed to be valid, and one who challenges them has the burden of showing their invalidity. *Mitchell v. Petsmart, Inc.*, 291 Kan. 153, 168, 239 P.3d 51 (2010). With respect to Roeder's constitutional claim, we have unlimited review over the constitutionality of the challenged regulation. The reviewing court may grant relief if the regulation is unconstitutional on its face or as applied. *In re Property Valuation Appeals of Various Applicants*, 298 Kan. 439, 447, 313 P.3d 789 (2013).

4

Roeder claims that as applied K.A.R. 44-12-306 is an impermissible viewpoint-discriminatory restriction on his right to free speech. The State contends that K.A.R. 44-12-306 as applied is a valid restriction on Roeder's right to free speech because it is reasonably related to legitimate penological interests.

K.A.R. 44-12-306(a) provides that "[a]n inmate shall not threaten or intimidate, either directly or indirectly, any person or organization." K.A.R. 44-12-306(c) states that "[t]he subjective impression of the target of the alleged threat or intimidation shall not be a factor in proving a violation of subsection (a)."

Discrimination against speech based on its message is presumptively unconstitutional. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). The burden rests on the government to justify restrictions placed on private speech. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). But the constitutional rights of prisoners are more limited in scope than the constitutional rights of individuals in society at large. A prison inmate has only those First Amendment rights that are consistent with the inmate's status as a prisoner and consistent with the legitimate penological objectives of the penal institution. *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974); see *Washington v. Werholtz*, 40 Kan. App. 2d 860, 197 P.3d 843 (2008), *rev. denied* 289 Kan. 1286 (2009). Prison officials are the primary arbiters of the problems that arise in prison management. *Shaw*, 532 U.S. at 230. Because the problems faced by prison officials "'are complex and intractable'" and courts are particularly "'ill equipped'" to deal with these problems, reviewing courts provide a level of deference to the judgments of prison officials in upholding the regulations against constitutional challenges. 532 U.S. at 229.

5

When a prisoner claims a prison regulation infringes on a constitutional right, we analyzes the validity of the regulation under the rational basis test to determine if it is "'reasonably related to legitimate penological interests.' [Citation omitted.]" *Pool v. McKune*, 267 Kan. 797, 804, 987 P.2d 1073 (1999). In *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the United States Supreme Court set forth four factors to consider in evaluating a regulation's reasonableness:

"(1) whether a valid and rational connection exists between the regulation and a legitimate governmental interest, (2) whether an alternative means of exercising the constitutional right at issue remains available to inmates, (3) the impact of accommodation of the asserted right upon guards, other inmates, and the allocation of prison resources, and (4) the absence of ready alternatives to the course of action taken in the regulation. [Citations omitted.]" *Washington*, 40 Kan. App. 2d at 863.

If the regulation satisfies these factors, the regulation still fails if the connection between the regulation and the asserted goal is "arbitrary or irrational." 482 U.S. at 89-90.

Roeder focuses on the first *Turner* factor and claims that K.A.R. 44-12-306 does not reasonably relate to legitimate penological interests as applied to him.

The district court characterized the underlying penological interest as "[d]eterring crime and stopping criminal activity . . . as well as maintaining internal security." Roeder concedes that preventing crime and maintaining internal security are legitimate governmental interests, but he contends the enforcement of the provision in this case was arbitrary and capricious because his statements to Leach were "merely commentary on a current event—the reopening of an abortion clinic—in which he speculated [the new clinic operator's] reopening of the clinic could invite violence."

6

We take from Roeder's argument that he makes no serious claim that the First Amendment protects as free speech threats and intimidation or the encouragement of others to commit murder. But he does claim that he did not encourage anyone to engage in unlawful or violent acts and that punishing him under K.A.R. 44-12-306 for expressing his personal opinions lacks any rational connection to the regulation's purpose of deterring criminal activity.

In considering this contention we cannot ignore the context of Roeder's remarks. Roeder and Leach had been friends for over 20 years based on their involvement in the pro-life movement and their roles as pro-life activists. Leach visited Roeder on a regular basis after Roeder was incarcerated and routinely reported on Roeder's case and published their conversations in his newsletter. Consistent with past conversations Roeder had with Leach, Roeder understood that the conversation was being recorded. He could reasonably anticipate that his remarks would be circulated among like-minded persons. A violation of K.A.R. 44-12-306 does not require a showing of the speaker's ability to carry out the threat. Here, Roeder knew he was speaking through Leach to persons who shared his penchant for ending abortions through criminal acts against abortion providers.

Roeder's murder of Dr. Tiller was only one of many violent acts against persons and facilities providing abortion services throughout this country. From 1977 to 2014 there were almost 7,000 attacks on abortion providers, including 8 murders, 17 attempted murders, 42 bombings, and 182 acts of arson (Kathy Pollitt—NY Times). Roeder was involved with a group of people associated with the pro-life movement that advocated violence as a method for closing clinics that provided abortions. His statement that 8 doctors had been killed and "we got 92 to go" encouraged the continued murdering of

7

abortion providers and was designed to threaten and intimidate the new operator of Dr. Tiller's former clinic.

K.A.R. 44-12-306 serves a legitimate penological objective of preventing or deterring criminal activity. See *Pool*, 267 Kan. at 804. There is a valid, rational connection between the regulation restricting threatening or intimidating statements and behavior and a legitimate governmental interest.

Roeder's reliance on *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) is unfounded. *Elonis* dealt with the proof needed to establish a crime under 18 U.S.C. § 875(c) (2006). Here, we are dealing with a regulatory proceeding, not a charge of criminal conduct.

Roeder's statements to Leach were not subject to the constitutional protections of the First Amendment. Because there is no constitutional violation, Roeder fails to prove shocking and intolerable conduct or continuing mistreatment of a constitutional stature. See *Schuyler v. Roberts*, 285 Kan. 677, 679, 175 P.3d 259 (2008). Thus, the district court did not err in denying relief on Roeder's K.S.A. 60-1501 petition.

As a separate issue, Roeder challenges the sufficiency of the evidence against him, arguing that his statements did not constitute intimidation and that the district court improperly upheld the hearing officer's finding that he violated K.A.R. 44-12-306. But to convict an inmate of a disciplinary violation, the hearing official need only find "'some evidence'" to support the offense. *Speed v. McKune*, 43 Kan. App. 2d 444, Syl. ¶ 1, 225 P.3d 1199 (2010). On appeal, we review "the record to determine if there is any evidence that supports the conclusion reached" in the disciplinary proceeding. 43 Kan. App. 2d 444, Syl. ¶ 1; see *Superintendent v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 86 L. Ed.

8

2d 356 (1985). In doing so, we do not reweigh the evidence or assess the credibility of the witnesses. Our role is merely to examine the record to determine if the evidence that supports the hearing officer's conclusion met this minimal evidentiary standard. *Anderson v. McKune*, 23 Kan. App. 2d 803, 807-08, 937 P.2d 16, *rev. denied* 262 Kan. 959, *cert. denied* 522 U.S. 958 (1997). Roeder bears the burden of proving that prison officials failed to satisfy this minimal evidentiary requirement. See *Sammons v. Simmons*, 267 Kan. 155, 159, 976 P.2d 505 (1999).

K.A.R. 44-12-306 does not include a definition of intimidating. It does provide for an objective rather than subjective determination of whether a statement is intimidating. It specifically provides that "[t]he subjective impression of the target of the alleged threat or intimidation shall not be a factor in proving a violation of [this regulation]." K.A.R. 44-12-306(c). A panel of this court has determined that under K.A.R. 44-12-306 an inmate's actions are objectively threatening or intimidating if "a reasonable person of ordinary sensibilities would find them so." *Grossman v. Kansas Department of Corrections*, No. 106,916, 2012 WL 3171990, at *5 (Kan. App. 2012) (unpublished opinion); see *State v. Phelps*, 266 Kan. 185, 196, 967 P.2d 304 (1998).

Roeder relies on *Phelps* which involved a criminal charge of aggravated intimidation of a witness against Fred Phelps who displayed a sign in the presence of the intended victim accusing him of being a "'Fat, Ugly, Sodomite'" and stating, "'Gays are Worthy of Death.'" 266 Kan. at 186. At trial the victim acknowledged that Phelps did not say anything to him that was intimidating. On appeal, our Supreme Court concluded that these facts were insufficient to establish aggravated intimidation of a witness. 266 Kan. at 196-97.

Phelps, for all his faults, was no murderer. There was no indication in the *Phelps* case that Phelps was linked to organizations that endorsed violence and whose members committed crimes of violence against their targets. The same cannot be said for Roeder. Roeder associated with groups that advocated violence against abortion providers. In speaking to Leach about the reopening of the Wichita clinic, remarks he anticipated would be circulated among like-minded individuals, Roeder referred with tacit approval to Bray's statement about ending the practice of abortion by killing those who performed them. Bray said, "'If 100 abortionists were shot, they would probably go out of business.'" Roeder added his own observation: "'I think 8 have been shot, so we got 92 to go. Maybe she'll be number nine. I don't know, but she's kind of painting a target on her[self].'" A reasonable person in the position of one who was reopening the clinic in Wichita would view Roeder's statements as threatening and intimidating. *Phelps* does not advance Roeder's argument.

Roeder also relies on *United States v. Dillard*, 989 F. Supp. 2d 1169 (D. Kan. 2013), *aff'd in part and rev'd in part* 795 F.3d 1191 (10th Cir. 2015), a civil case alleging a violation of the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a)(1) (2006). There, the defendant wrote to a Wichita physician and described the danger the physician would be placing herself in by offering abortion services. The defendant stated: "'You will be checking under your car every day—because maybe today is the day someone places an explosive under it.'" 989 F. Supp. 2d at 1171. The federal district court granted summary judgment in favor of the defendant. But on review, the Tenth Circuit Court of Appeals determined that there was a genuine issue of material fact as to whether the letter sent to the physician conveyed a true threat of violence. See *Dillard*, 795 F.3d at 1200-02. The Tenth Circuit placed emphasis on the context in which the comments were made, noting Dillard's friendship with Roeder:

10

"The context in this case includes Wichita's past history of violence against abortion providers, the culmination of this violence in Dr. Tiller's murder less than two years before Defendant mailed her letter, Defendant's publicized friendship with Dr. Tiller's killer, and her reported admiration of his convictions. When viewed in this context, the letter's reference to someone placing an explosive under Dr. Means' car may reasonably be taken as a serious and likely threat of injury." 795 F. 3d at 1201.

*Dillard* was a civil case which required a preponderance of evidence to support the government's position. In our present case, the evidence needed to support Roeder's disciplinary conviction was only some evidence. In *Dillard*, whether the defendant's statements violated the federal statute was to be decided by the jury. In our present case, the facts were decided by the prison hearing officer. The hearing officer found that Roeder's statements violated the prison regulation. Viewed in context, there clearly was some evidence to support the hearing officer's finding that Roeder's statements were threatening and intimidating in violation of K.A.R. 44-12-306(a).

Finally, Roeder claims that K.A.R. 44-12-306 is unconstitutionally vague and overbroad. In our unlimited review of this issue we conclude that this regulation is neither.

When, as here, a regulation is claimed to be unconstitutionally vague, we must determine (1) whether the regulation conveys a sufficiently definite warning and fair notice of the proscribed conduct in light of common understanding and practice and (2) whether the regulation adequately guards against arbitrary and discriminatory enforcement. See *Steffes v. City of Lawrence*, 284 Kan. 380, 389, 160 P.3d 843 (2007).

When, as here, a regulation is claimed to be unconstitutionally overbroad, we must determine (1) whether the protected activity is a significant part of the law's target and (2)

11

whether there exists a satisfactory method of severing that law's constitutional from its unconstitutional applications. See *Dissmeyer v. State*, 292 Kan. 37, 40-41, 249 P.3d 444 (2011).

K.A.R. 44-12-306(a) provides that "[a]n inmate shall not threaten or intimidate, either directly or indirectly, any person or organization." This regulation is not vague. It uses words that are in common usage and understanding. The regulation conveys a definite warning and fair notice as to what conduct is prohibited. One need not guess as to the regulation's meaning. Roeder also faults the regulation because it does not contain a *mens rea* requirement. But Roeder was charged with a disciplinary violation, not a crime.

Roeder's final argument is that the regulation is overbroad because it criminalizes conduct that in some circumstances is constitutionally protected, such as free speech. In considering this argument we apply a common-sense approach in determining what conduct the regulation prohibits. See *State v. Wilson*, 267 Kan. 550, 556-58, 987 P.2d 1060 (1999). Here, the regulation does not infringe upon free speech rights. The attenuated free speech rights of prison inmates are not affected by K.A.R. 44-12-306. Inmates are free to express general opinions on political and social issues, including opinions on or comments about the reopening of an abortion clinic in Wichita. But the regulation does prohibit a prison inmate's threats and intimidation that arise directly or indirectly from endorsing, advocating, or encouraging the murder of a specific individual.

K.A.R. 44-12-306 restricts only behavior which is inconsistent with the limited rights of prison inmates and which is contrary to the legitimate penological objectives of the correction system. K.A.R. 44-12-306 is not unconstitutionally overbroad.

12

Affirmed.