No. 79,412

STATE OF KANSAS, *Appellant*, v. FRED W. PHELPS, SR., *Appellee*.

(967 P.2d 304)

Opinion filed November 6, 1998.

*Joan M. Hamilton*, district attorney, argued the cause, and *Joel W. Meinecke*, assistant district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellant.

*Fred W. Phelps, Sr.*, appellee, argued the cause and was on the brief pro se.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the State from an order dismissing the criminal charges filed by the State. The defendant, Fred W. Phelps, Sr., was charged with two felony counts of aggravated intimidation of a witness, contrary to K.S.A. 21-3833, and disorderly conduct, a misdemeanor, contrary to K.S.A. 21-4101.

This case originated in 1992, nearly 7 years ago, and has traveled many paths so that it is necessary to focus on the legal issues involved and not become enamored with the many interesting but irrelevant arguments. The facts and procedural history (highly summarized) commenced on March 22, 1992. The victim, Jerry Palmer, was en route to a political fund raiser at the Jayhawk Hotel in Topeka. The defendant and others were picketing the event and were on the sidewalk in front of the Jayhawk Hotel. Phelps called Palmer a "sodomite." Phelps, in the presence of others, then twice called Palmer a "fat, ugly, sodomite."

Palmer complained to the then district attorney who took no action. A new district attorney took office, and a complaint was filed against Phelps in February 1993, charging him with disorderly conduct pursuant to K.S.A. 21-4101.

For some period of time (at least 1 year), Phelps and his followers had picketed St. David's Episcopal Church (St. David's) and a number of other churches, businesses, and public places in Topeka, and throughout Kansas and the United States. St. David's and other churches and organizations had actively opposed the picketing.

On June 20, 1993, Palmer arrived at St. David's where he attended church. Jonathan Phelps, son of Phelps, was standing in front of St. David's holding a sign. The sign was actually two signs joined together, with one sign on top of the other, with the two staffs forming a single staff.

The top half of the sign read, "Pig Palmer FUS." The record makes it clear that "FUS" was intended to mean "Fat, Ugly, Sodomite." The bottom half of the sign read, "Gays Are Worthy Of Death," with a biblical reference to "Romans 1:32."

St. David's is on the northwest corner of the intersection of 17th Street and Gage Boulevard. Phelps was carrying a sign unrelated to Palmer and was picketing south of the southeast corner of 17th Street and Gage Boulevard on the east side of Gage Boulevard. Jonathan Phelps was in front of St. David's, which would have placed him west of the intersection on the north side of 17th Street.

Palmer was the only witness in this case, and he acknowledged that neither Phelps nor Jonathan Phelps said anything to him that was intimidating. Palmer filed a police report requesting that Phelps and Jonathan Phelps be charged with aggravated intimidation of a witness or intimidation of a witness.

The following Sunday, the same sign, or one nearly identical, was displayed by Jonathan Phelps in front of St. David's. The record is not clear, but when the evidence is viewed in a light most favorable to the State, Palmer was present at church. He did not personally view the sign, but was told about it by others.

The procedural history of the charges that were filed and amended are of no importance. Phelps was ultimately charged with disorderly conduct, a misdemeanor arising from the incident near the Jayhawk Hotel in 1992, to-wit:

"[W]ith knowledge that such acts will alarm, anger or disturb others, to-wit: Jerry R. Palmer, FRED W. PHELPS, SR. did use offensive, obscene or abusive language tending reasonably to arouse alarm, anger or resentment in others, to-wit: Jerry R. Palmer, contrary to the form of the [statutes] in such case made and provided and against the peace and dignity of the State of Kansas."

Phelps and Jonathan Phelps were also charged with two felonies, as follows:

"On or about the 18th day of June, FRED W. PHELPS, SR. and JONATHAN BAXTER PHELPS, in Topeka, Shawnee County, Kansas, did knowingly, feloniously and maliciously attempt to prevent or dissuade a witness, to-wit: Jerry Palmer from giving testimony in a criminal proceeding or causing a complaint from being sought with constant harassing and an offensive picket sign about the witness, to-wit: 'PIG PALMER FUS', (meaning fat, ugly, sodomite), such act being done in furtherance of a conspiracy, and did also display another sign attached to the 'PIG PALMER FUS' sign reading, 'Gays are Worthy of Death' and on the other side reading, 'God Hates Fags', such acts being an implied threat of force or violence against the witness, to wit: Jerry Palmer, contrary to the form of the statutes in such case and peace and dignity of the State of Kansas."

and

"On or about the 27th day of June, FRED W. PHELPS, SR. and JONATHAN BAXTER PHELPS, in Topeka, Shawnee County, Kansas, did knowingly, feloniously and maliciously attempt to prevent or dissuade a witness, to-wit: Jerry Palmer from giving testimony in a criminal proceeding or causing a complaint from being sought with constant harassing, and an offensive picket sign about the witness, to-wit: 'PIG PALMER FUS' (meaning fat, ugly, sodomite), and another sign reading, 'FAG Church' with 'PIG PALMER FUS' attached, such acts being done in furtherance of a conspiracy, and did also display another sign attached to the 'PIG PALMER FUS' sign reading, 'Gays are worthy of Death' such acts being an implied threat of force or violence against the witness, to wit: Jerry Palmer, contrary to the form of the statutes in such case and peace and dignity of the State of Kansas."

At the preliminary hearing before Judge Rosen, Palmer testified that he was intimidated by a sign with his name on it, singling him out as a sodomite and declaring that gays are worthy of death. He explained that FUS stood for fat, ugly, sodomite and that FUS was on the same staff as the phrase "Gays Are Worthy Of Death." Palmer testified that "sodomite, fag, and gays are used collectively in their vocabulary to mean homosexuals." Thus, "[i]f I'm a sodomite and that equals gays and gays are worthy of death, then I am worthy of death. That is the communication." Palmer acknowledged that neither Phelps nor Jonathan Phelps said anything to him that was intimidating.

When Hamilton asked Palmer whether the events of June 20 and June 27 had any impact on him as a possible witness to the State in the disorderly conduct case, Palmer replied that he "was paying a price." This "price" included "loss of privacy, being harassed at my church, being the subject of faxes and lies spread all over this community by the fax ministry of Westboro Baptist Church. You know, that's bothersome."

Phelps and Jonathan Phelps both requested to represent themselves at the preliminary examination. Palmer was the only witness to testify at the preliminary examination. Palmer maintained that he had experienced physical symptoms as a result of the implied threats. He could not specify that these symptoms were specifically tied to the June 20 or June 27 event, but asserted that he saw the Phelps' actions as a pattern of harassment and intimidation. Palmer stated that after the June 20 incident, his blood pressure was high,

he had trouble sleeping, and he had to have medicine prescribed for his high blood pressure and inability to sleep.

Phelps did not follow Judge Rosen's repeated warnings to follow the rules of evidence and court rulings while cross-examining Palmer. Judge Rosen terminated Phelps' self-representation.

Judge Rosen gave Phelps approximately 1 month to retain counsel and to prepare for continuation of the preliminary examination. On January 19, 1996, a writ of habeas corpus was filed with this court, seeking relief from Judge Rosen's termination of Phelps' pro se representation. We denied relief, and the preliminary examination was recommenced on February 8, 1996, with Fred Phelps, Jr. replacing Phelps, pro se, as counsel.

When ruling on whether the State had established probable cause, Judge Rosen first remarked that the court had set up "a reasonable manner in which the defense would be allowed to present witnesses on their own behalf and that they did not proceed in a reasonable fashion and accordingly chose not to present a defense in their own behalf." He then referred to *State v. Bell*, 259 Kan. 131, 910 P.2d 205 (1996), and set out some of the standards for determining whether probable cause exists. Judge Rosen quoted: "If there is a conflict in witness testimony that creates a question of fact for the jury, the preliminary hearing judge must accept the version of the testimony which is most favorable to the State." *Bell*, 259 Kan. at 133, citing *State v. Jones*, 233 Kan. 170, 174, 660 P.2d 965 (1983). The *Bell* court also held that "[i]n order to prove probable cause, there must be evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." 259 Kan. 131, Syl. ¶ 3.

Judge Rosen noted that the State had charged Phelps and Jonathan Phelps in the alternative, such that to establish the charge of aggravated intimidation of a witness or victim, it must be shown that Phelps and Jonathan Phelps had prevented or dissuaded, or "attempted to prevent or dissuade the victim or witness—from testifying, that the act was accompanied by an expressed [or] implied threat, force or violence against the person, or that it was in furtherance of a conspiracy." Judge Rosen first analyzed whether they had attempted to dissuade Palmer from testifying and, if so,

whether it was done maliciously and with an implied threat of force or violence against the person. He ruled:

"Mr. Palmer was clear in his testimony that on the two days in question, the 20th and 27th, that he indeed was threatened, that he indeed was in fear and felt endangered by the conduct of the defendants, and again taking the evidence in the light most favorable to the State, I believe that there is probable cause and, again, this is only a probable cause determination to believe that that element of the crime has been satisfied."

Judge Rosen thus held that there was probable cause to bind Phelps and Jonathan Phelps over for trial on the aggravated intimidation charges. He also certified the misdemeanor disorderly conduct charge against Phelps for trial.

On March 28, 1996, Phelps filed a motion to set aside the finding of probable cause, to dismiss, and for appropriate relief. Phelps argued that the finding of probable cause was not supported by either direct or circumstantial evidence; that he did not hold a sign about Palmer; and that he took no action whatsoever toward or against Palmer. He asserted that he was merely present on one occasion when Palmer allegedly observed Jonathan Phelps holding a sign with a reference to Palmer, and that the State had not presented any evidence that he "had any knowledge of the sign, any involvement in the sign's location, or any control of any kind over what Jonathan Phelps or Mr. Palmer said or did on that date." Phelps further claimed, among other assertions in his motion, that he was denied his right of self-representation without a lawful or factual basis; that due to this revocation of self-representation, his new counsel, Fred Phelps, Jr., did not have the opportunity to prepare and present a defense; and that he and Jonathan Phelps were both denied the right to complete their cross-examination of Palmer.

On March 17, 1997, the Shawnee County District Court held a hearing on Phelps' motion to set aside the finding of probable cause, to dismiss, and for appropriate relief. Senior District Judge Melvin Gradert was assigned to hear arguments on the motions.

The trial court dismissed the pending charges, reasoning as follows:

"The amended (2nd) complaint, in this case, alleges in counts 2 and 3, Aggravated Intimidation of a Witness, and Aggravated Intimidation of a Witness, in furtherance of a conspiracy respectively.

"The elements regarding these counts are as follows:

"On or about the dates alleged, Fred Phelps and Jonathan Phelps—

"1. Knowingly and

2. Maliciously

3. Attempted to prevent or dissuade

4. A witness, Jerry Palmer,

5. Either

(a) From giving testimony in a criminal proceeding

or

(b) From causing a complaint to be sought

[with constant harassing and an offensive picket sign about the witness, namely, 'Pig Palmer FUS,' meaning fat, ugly sodomite,

AND

6. Either

(a) In furtherance of a conspiracy

OR

(b) By an implied threat of force or violence against the witness from picket signs reading 'Pig Palmer FUS,' 'Gays Are Worthy of Death Romans 1:32' and 'God Hates Fags.'

"By applying these standards to the evidence in this case, it seems clear to this Court that the State did not meet its burden. The only evidence offered was through the alleged victim, Jerry Palmer.

"The finding of probable cause was not supported by the evidence to prove the elements as outlined above. There was not sufficient evidence to support a finding of probable cause that a crime had occurred or that either of these defendants committed a felony crime. The evidence does not support a claim that either defendant acted with any intent to intimidate or otherwise act in any unlawful manner.

"The only testimony in the transcript is that of Mr. Palmer which reveals that the basis for the criminal action against the defendants is his personal, subjective, and emotional reaction to the words on the picket signs of the defendants.

"To arrive at probable cause in this case would require a supposition or speculation that any unlawful or malicious, or criminal intent or purpose was involved. The sum total of the evidence was a claim by Mr. Palmer that certain words on a sign, held by one of the defendants, which Mr. Palmer saw on one occasion upset him. Such does not supply the requisite elements to constitute a crime of any kind, much less the felony of aggravated intimidation of a witness.

"The only evidence offered to support a claim of conspiracy to commit the crimes alleged apparently was the association and knowledge of the defendants or their acts. Jonathan Phelps was representing Fred Phelps, as one of several

attorneys from Phelps Chartered, in connection with misdemeanor charges. Jonathan Phelps at the same time had been picketing and preaching to persons.

"Conspiracy to commit a crime is not established by mere association or knowledge of acts of the other parties. There must be some intentional participation in the conspiracy with a view to the furtherance of the common design and purpose. *State v. Roberts*, 223 Kan. 49.

"The probable cause determination against these defendants is unsupported by the evidence.

"In addition the Magistrate improperly terminated the preliminary examination, and denied Mr. Phelps his right of self-representation, without a lawful or factual basis. Both defendants were denied their right to present any defense. Mr. Phelps' new counsel was denied any opportunity to prepare to present a defense during the preliminary hearing.

"The Court desires to make clear that it recognizes the strong and emotional component underpinning the position of both the State, the Defendants, and the Complaining Witness, Mr. Jerry Palmer. Lest there be some misunderstanding about the court's position and basis for its ruling by virtue of the thirty four exhibits admitted at the hearing on this motion dealing with the religious beliefs of the defendants. There is no question in this court's mind that the members of the Westboro Church and the Defendants, as members of the church individually, subscribe to certain religious beliefs and are sincere in their attempts to follow and advance such beliefs.

"This did not, however, control the Court's ruling. My ruling is based simply and purely upon the lack of probable cause to prove a crime herein has been committed nor is there proof of probable cause that these defendants or either of them committed the crimes of Aggravated Intimidation of a Witness or Conspiracy so to do, under the facts established at the preliminary hearing. The elements have not been established . . . under the facts as contained in the transcript nor can they be."

The State then appealed pursuant to K.S.A. 22-3602(b)(1), which authorizes an appeal to the Kansas Supreme Court by the prosecution from an order of the district court dismissing a complaint.

In *State v. Bell*, 259 Kan. 131, Syl. ¶ 5, 910 P.2d 205 (1996), this court held:

"In appeals by the prosecution from an order discharging the defendant for lack of probable cause that a crime has been committed, this court follows the same standard for weighing the evidence as the judge at the preliminary examination. This court is to conduct a de novo review of the evidence when considering the trial court's probable cause finding."

Phelps argues that the standard of review for a negative finding is applicable to the case at hand. (On appeal, a negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, *Brown v. Kansas Parole Board*, 262 Kan. 903, 943 P.2d 1240 [1997].) That contention is without merit. In *State v. Sherry*, 233 Kan. 920, 935, 667 P.2d 367 (1983), the court stated that "[a] judge reweighing the preliminary examination evidence after arraignment and prior to trial must follow the standard for weighing the evidence as required for the preliminary examination." We have repeatedly held that an appellate court conducts "a de novo review of the evidence when considering the trial court's preliminary hearing probable cause finding." *State v. Martinez*, 255 Kan. 464, 465, 874 P.2d 617 (1994); *State v. Starks*, 249 Kan. 516, 517, 820 P.2d 1243 (1991).

In *State v. Farmer*, 259 Kan. 157, 161, 909 P.2d 1154 (1996), the court held:

> "The function of a judge or magistrate at a preliminary hearing is not to determine the wisdom of the prosecuting attorney's decision to file and pursue charges against the defendant. Nor is it the function of the judge to conclude that there should be no prosecution because the possibility of a conviction may be remote or virtually nonexistent. *State v. Puckett*, 240 Kan. 393, Syl. ¶ 3, 729 P.2d 458 (1986). The sole question before the judge or magistrate at the conclusion of a preliminary hearing is the same question an appellate court is faced with upon de novo review: whether the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. See 240 Kan. 393, Syl. ¶ 1."

## I. JURISDICTION

Phelps argues that he was charged with three counts in one charging document and that only the two felony charges were dismissed, leaving the misdemeanor count pending in the trial court. The State, on the other hand, takes the position in its brief that Judge Gradert did dismiss the misdemeanor charge of disorderly conduct, but that it was error for him to do so.

The law in Kansas is clear that

> "[t]here is no statutory authority for the State to appeal from the dismissal in a criminal case of some of the counts of a multiple-count complaint, information,

or indictment while the case remains pending before the district court on all or a portion of the remaining counts which have not been dismissed and which have not been finally resolved." *State v. Nelson*, 263 Kan. 115, Syl. ¶ 3, 946 P.2d 1355 (1997).

The record before us is not as clear as it should be, particularly because no journal entry has been filed concerning the misdemeanor charge for disorderly conduct.

Here, Phelps is put in the position that he must argue that the trial court did not dismiss the misdemeanor charge when the State asserts that the charge was dismissed. Our reading of the record shows that Phelps asked that the misdemeanor disorderly conduct charge be dismissed in his "Renewed Motion to Set Aside Finding of Probable Cause, To Dismiss, and For Appropriate Relief." Four of the 16 numbered paragraphs deal specifically with the misdemeanor disorderly conduct charge, and the prayer for relief clearly requests that the misdemeanor charge be dismissed on as many as four different theories. At oral argument on his motion, Phelps also mentioned dismissal of the misdemeanor charge. In addition, the trial court's journal entry states "that the *charges* against the defendants are dismissed." (Emphasis added.) At oral argument in this appeal, the district attorney informed the court that Judge Gradert also canceled the misdemeanor trial date which is further indication he intended to dismiss the misdemeanor charge.

Obviously, we would like a record that clearly states the trial judge dismissed the misdemeanor count. However, the record, coupled with the State's admission that the trial judge dismissed the misdemeanor count, is sufficient to satisfy us that the count was dismissed and that we have jurisdiction. Whether the dismissal was error will be discussed later in this opinion.

## II. PROBABLE CAUSE

Counts 2 and 3 charged Phelps and Jonathan Phelps with aggravated intimidation of a witness or victim (K.S.A. 21-3833). Counts 2 and 3 are identically worded with the exception of different dates. Count 2 relates to the June 20, 1993, incident, whereas Count 3 refers to the June 27, 1993, episode. The specific aggravated intimidation of a witness or victim charges alleged

against Phelps and Jonathan Phelps were specifically quoted earlier in this opinion.

The First Amendment to the United States Constitution does offer a defense to protected speech and religious freedom. It does not, however, allow one to commit a crime and then seek protection based on a personal interpretation of the Bible not shared by a recognized religious group or clearly exercised as a religious act. Where the line is drawn, however, cannot be a bright line. We need not concern ourselves with attempting to specify the location of this line because we agree with the trial judge that the State did not sustain its burden to show that probable cause existed that the two felonies were committed.

For the State to establish probable cause that the two felonies were committed, the State must prove probable cause to believe that Phelps acted knowingly and maliciously; that he attempted to prevent or dissuade Palmer from testifying against him; that the attempt to prevent or dissuade Palmer from testifying was accompanied by an expressed ·or implied threat of force or violence against Palmer; *or* that the attempt to prevent or dissuade Palmer from testifying was in furtherance of a conspiracy to do so.

The district court concluded that the only evidence offered at the preliminary hearing of a conspiracy was the association and knowledge of the defendants or their acts and that conspiracy to commit a crime is not established by mere association or knowledge of acts of other parties. The State did not attempt to dispute this finding in its brief or offer authority to support a conspiracy. Thus, we reach the same conclusion as the trial judge; there is not sufficient evidence in the record to support a finding of probable cause on the conspiracy theory.

We are satisfied the proper test on the intimidation or aggravated intimidation charges is the reasonable person test. The fact that Palmer is a seasoned trial lawyer and a brave man does not affect the test; a frail, timid person, who sees every act of another person as a threat, would be subject to the same standard as Palmer. The proper test to determine the reaction of an alleged victim in an intimidation or aggravated intimidation .charge is objective, not subjective, *i.e.*, that of a reasonable person. There are exceptions

to this rule, such as where the perpetrator has knowledge of a particular vulnerability of the victim and then acts with full knowledge of the victim's vulnerability.

The term "threat" is defined under the general definitional section of the criminal code. K.S.A. 21-3110. This statute provides that "[t]he following definitions shall apply when the words and phrases defined are used in this code, except when a particular context clearly requires a different meaning." The term "threat" is not specifically defined under the aggravated intimidation of a witness or victim statute, and consequently the statutory definition applies: " 'Threat' means a communicated intent to inflict physical or other harm on any person or on property." K.S.A. 21-3110 (24). The next question is whether sufficient evidence regarding Phelps' acts on June 20, 1993, and June 27, 1993, established probable cause that the acts were threats of force or·violence against Palmer, within the context of the aggravated intimidation statute.

In *United States v. Smith*, 670 F.2d 921 (10th Cir. 1982), the Tenth Circuit Court of Appeals approved an instruction regarding the term "threat" that read:

" 'The term "threat" means an avowed present determination or intent to injure presently or in the future. A statement may constitute a threat even though it is subject to a possible contingency in the maker's control. The prosecution must establish a "true threat," which means a serious threat as distinguished from words uttered as mere political argument, idle talk or jest. In determining whether words were uttered as a threat the context in which they were spoken must be considered.' " 670 F.2d at 923 n.2.

This case, in large part, turns on whether a reasonable person, having knowledge of the sign displaying the phrase "Gays Are Worthy Of Death, Romans 1:32," would believe those words and, when coupled with a sign that furnishes probable cause for a reasonable person to believe the sign referred to that person as a homosexual (or "gay"), would take such language as a threat that the person or persons displaying the sign would inflict or cause to be inflicted physical or other harm to the person named on the combined signs. We conclude, as did the trial judge, that the State did not present sufficient evidence at the preliminary examination to establish probable cause that Phelps attempted to prevent or dissuade Pal-

mer from testifying against him by an expressed or implied threat of force or violence against Palmer.

## III. MISDEMEANOR

The State asserts that the district court judge ruled that the misdemeanor disorderly conduct charge against Phelps was dismissed based solely on lack of probable cause. Judge Gradert, however, could not have dismissed the misdemeanor due to lack of probable cause because the merits of the disorderly conduct charge were excluded from the preliminary hearing by Judge Rosen. Judge Rosen ruled that the underlying crime of disorderly conduct, as a result of the incident at 7th and Jackson Streets in March 1992, was only relevant to the preliminary hearing for the fact that the charge exists and that the disorderly conduct charge is what generates the two additional charges of aggravated intimidation. No additional evidence was presented to Judge Gradert, other than exhibits that have no bearing on the misdemeanor disorderly conduct charge.

The reverse situation, however, does not lead to the same result. Simply because the court determined there was no probable cause for the felony intimidation of a witness or victim does not mean that the underlying misdemeanor charge giving rise to the felony charges could not be proved. Under K.S.A. 22-3202(2), if the defendant is not bound over on the felony count, "defendant shall be tried on the misdemeanor count in the same manner as other prosecutions for misdemeanors."

The trial court erred in dismissing the disorderly conduct charge. We do not pass on the speedy trial issues or the constitutionality of the disorderly conduct statute. These are issues to be presented to and ruled on by the trial court pursuant to the pending motions.

## IV. CONCLUSION

The trial court is affirmed as to the felony counts and reversed as to the misdemeanor disorderly conduct charge. The remaining issues raised by the parties are moot.