(336 P.3d 336)
No. 109,313

STATE OF KANSAS, *Appellee*, v. BREONNA M. WILKINS, *Appellant.*

Opinion filed October 31, 2014.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., STEGALL, J., and BUKATY, S.J.

STEGALL, J.: Breonna Wilkins was convicted of aggravated intimidation of a witness in violation of K.S.A. 2011 Supp. 21-5909. This is Wilkins' direct appeal claiming: (1) the conviction was not supported by sufficient evidence; (2) the language of K.S.A. 2011 Supp. 21-5909 is unconstitutionally vague; and (3) a jury instruction error. Because we find that no reversible error occurred below, we affirm.

## FACTS

In July of 2011, Natalie Gibson was murdered and Lori Allison was shot outside of their home in Topeka, Kansas. Eventually, nine individuals were arrested and charged as codefendants in connection with these crimes. Most of the codefendants were either related to or well known by Wilkins. Among them were her boyfriend, Ronald Wakes, and another friend, juvenile F.W. Over the course of multiple legal proceedings, two of the codefendants— Bayate Covington and another juvenile, D.R.—accepted plea agreements with the State and began to provide testimony on behalf of the State concerning the events in question.

Wilkins and Wakes were recorded during numerous phone calls while Wakes was in custody. On August 28, 2011, the two discussed the case against Wakes. Wilkins said, "I'm just worried about you know, what everybody else is saying." Wakes replied, "Yeah, I'm saying if everybody keep their mouth shut, and can't nobody prove nothing." During a later conversation, Wilkins and Wakes discussed contacting one of the codefendants who had been placed in protective custody (Covington was being held in protective custody after agreeing to cooperate with the State). Wilkins, however, told Wakes, "Nobody knows where he's at." She said she was writing Covington a letter though, and Wakes said, "Good. Make him

feel . . . miserable for lying." Still later, Wilkins and Wakes discussed another codefendant, Jimmy Netherland, and Wakes asked Wilkins to come to the jail and talk to Netherland. Wakes told Wilkins to "tell him to keep his . . . mouth shut." Wilkins said she would look into it.

Wilkins never communicated directly with F.W. Wilkins did deliver messages via a third party to F.W. (nicknamed "Nookie") while F.W. was in custody. Z.A., a juvenile known to Wilkins and in a dating relationship with F.W., spoke to F.W. on Wilkins' behalf during another recorded jailhouse phone call. Z.A. told F.W., "[Wilkins] just asked about you like, do you know what Nookie's doing? I was like yeah, she's thinking about pleaing or whatever, and then she was like tell her not to because I've talked to like, uh, a couple different lawyers, and they're saying all the DA is trying to do is get everybody to plea out because they don't have enough evidence." During a subsequent conversation, F.W. and Z.A. were discussing news reports that described various codefendants providing testimony on behalf of the State. Z.A. said, "[D.R.] testified. . . . I guess [he] took the plea that everybody was offered . . . you didn't take that shit did you?" F.W. replied that she had not taken any plea offer. F.W. then asked, "How do you know [D.R.] took that plea?" Z.A. replied, " 'Cause that's what Breonna said. . . . And she was like please tell me Nookie didn't take it."

Z.A. also testified during Wilkins' trial that Wilkins "asked me if [F.W.] had taken a deal, and I told her that she was thinking about taking one." Wilkins then told Z.A. "to tell [F.W.] not to take a deal." After Z.A. urged F.W. not to accept a plea offer from the State, F.W. did in fact reject a plea offer that would have allowed her to be prosecuted as a juvenile rather than an adult in exchange for her truthful testimony. She subsequently accepted a less favorable plea offer after being certified to stand trial as an adult. F.W. testified that she was motivated to reject the State's favorable plea offer by Wilkins' admonition which had been communicated to her through Z.A.

Wilkins was charged with and convicted of aggravated intimidation of a witness. She was given a suspended sentence of 18

months in prison and placed on 24 months' probation. She timely appeals.

ANALYSIS

Specifically, the State charged Wilkins with dissuading or attempting to dissuade F.W. from providing testimony with the intent to thwart or interfere with the orderly administration of justice in violation of K.S.A. 2011 Supp. 21-5909. Additionally, the State alleged two alternative aggravating factors, both of which were found by the jury. On appeal, Wilkins makes three claims of error: (1) that the evidence was insufficient to support the jury verdict; (2) that the statutory language "thwart or interfere in any manner with the orderly administration of justice" is unconstitutionally vague; and (3) that it was error for the jury not to be instructed on the meaning of that language.

*Sufficiency of the Evidence*

When reviewing a challenge to the sufficiency of the evidence in a criminal case our standard of review is well established. The appellate court must affirm the jury verdict if, "after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013). To the extent our review requires us to interpret the language of K.S.A. 2011 Supp. 21-5909, our review is unlimited. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

After reviewing the entire record and considering the evidence in a light most favorable to the prosecution, it is apparent that Ronald Wakes and his codefendants were stuck in a variant of the "prisoner's dilemma." This classic dilemma has been studied by theorists of strategy and negotiation for decades and has been described as follows:

"Two prisoners, unable to confer with one another, must decide whether to take the prosecutor's offer: confess, inculpate the other, and serve a year in jail, or keep silent and serve five years. If the prisoners could make a (binding) bargain with each other, they would keep silent and both would go free. But they can't

communicate, and each fears that the other will talk. So both confess." *Page v. United States*, 884 F.2d 300, 301 (7th Cir. 1989).

See also Schelling, *The Strategy of Conflict* 53-80, 119-61 (1960; 1980 rev.). By recruiting Wilkins to serve as an outside conduit of communication, Wakes hoped to side-step the prosecution and defeat the prisoner's dilemma.

Wakes and Wilkins discussed urging multiple codefendants to keep quiet. Wilkins knew, however, that the united front of silence among her friends and relatives in jail was crumbling—the prosecution had successfully secured at least two highly publicized pleas resulting in testimony against the remaining codefendants. Further, Wilkins knew that another codefendant, F.W., had been offered a plea and was contemplating accepting it. In light of this knowledge, Wilkins (via Z.A.) successfully dissuaded F.W. from accepting the State's plea offer and, hence, from providing testimony in the ongoing criminal proceedings.

Wilkins claims that the evidence only shows that she dissuaded F.W. from accepting a plea, not from providing testimony. We are not convinced. A rational factfinder could draw a reasonable inference from the totality of the evidence that Wilkins clearly understood that by dissuading F.W. from accepting a plea she was necessarily accomplishing her true objective—to keep F.W. from providing testimony against Wakes and the other codefendants.

Wilkins next argues that the evidence was insufficient to prove that her actions were undertaken with the intent to thwart or interfere with the orderly administration of justice. Again, her argument fails. In other contexts, the United States Supreme Court has recognized "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed.2d 717 (1978). This opportunity is intimately tied to notions of the orderly administration of justice. See, *e.g., Lockhart v. Nelson*, 488 U.S. 33, 48, 109 S. Ct. 285, 102 L. Ed.265 (1988) (Marshall, J., dissenting) (describing the prosecution's one complete opportunity to convict as embodying "society's interest in the orderly administration of justice"); *County of Los Alamos v. Tapia*, 109 N.M. 736, 742, 760 P.2d 1017 (1990) (same).

Plea agreements that include provisions requiring the defendant to cooperate with the State and provide truthful testimony in ongoing related criminal matters are an integral and necessary tool of the prosecution. Our Supreme Court has recognized the

"propriety of plea discussions and plea agreements in cases when it exists. The interest of the public in effective administration of criminal justice will be served if proper guidelines are followed. A county attorney may in proper instances engage in plea discussions for the purpose of reaching a plea agreement. He should engage in such discussions with the defendant only through defense counsel, except when the defendant is not eligible for or does not desire appointment of counsel and has not retained counsel." *State v. Byrd*, 203 Kan. 45, 51, 453 P.2d 22 (1969).

The *Byrd* court concluded that when safeguarded, "these discussions and agreements between an attorney for an accused and a prosecuting attorney are consistent with the fair and effective administration of justice." 203 Kan. at 50.

A rational factfinder could have concluded from the evidence that Wilkins intended to interfere with this protected plea bargaining process, which itself was part and parcel of the State's one complete opportunity to convict Wakes and the other codefendants, all of which furthered the public's interest in the orderly administration of justice in this case. Wilkins' argument that this result jeopardizes a defense attorney's or family member's ability to provide advice to a defendant in the midst of plea negotiations is without merit. A rational factfinder could reach the conclusion from the evidence presented in this case that Wilkins' intent was not to protect or further the interests of F.W.—a legitimate exercise that is not prohibited—but was rather to thwart the State's case against Wakes and the other codefendants by silencing a potential witness.

### Constitutionality

Wilkins next asserts that the phrase "thwart or interfere in any manner with the orderly administration of justice" in K.S.A. 2011 Supp. 21-5909 is unconstitutionally vague. Though Wilkins did not raise this issue below we will address it as it involves a pure question of law and its consideration will prevent any denial of Wilkins'

fundamental due process rights. See *State v. Barnes*, 293 Kan. 240, 255, 262 P.3d 297 (2011).

Determining a statute's constitutionality is a question of law that is reviewed de novo. *State v. McCaslin*, 291 Kan. 697, 730, 245 P.3d 1030 (2011). Statutes are presumed to be constitutional; all doubts must be resolved in favor of validity, and if there is any reasonable way to construe a statute as constitutionally valid, the court has the authority and duty to do so. *State v. Seward*, 296 Kan. 979, 981, 297 P.3d 272 (2013).

The test to determine whether a criminal statute is so vague as to be unconstitutional entails two related inquiries: (1) whether the statute gives fair warning to those potentially subject to it, and (2) whether it adequately guards against arbitrary and unreasonable enforcement. *City of Wichita v. Wallace*, 246 Kan. 253, 259, 788 P.2d 270 (1990). "At its heart the test for vagueness is a common-sense determination of fundamental fairness." *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977).

Wilkins asserts without citation to authority that the phrase "thwart or interfere in any manner with the orderly administration of justice" is vague because, as she previously argued, it could theoretically be broad enough to catch clearly proper acts (such as advice from defense counsel) in its dragnet. We disagree.

When the plain meaning of the words are taken together, the statute is not so broad as to lead an ordinary person to conclude that it prohibits advice given in good faith with the best interests of the witness in mind. "Justice" is defined as the "fair and proper administration of laws." Black's Law Dictionary 942 (9th ed. 2009). Likewise, as discussed above, the orderly administration of justice has been understood to encompass the State's one complete opportunity to convict those who have violated its laws. "Thwart" is defined to mean "to run counter to so as to effectively oppose or baffle; contravene; to oppose successfully; defeat the hopes or aspirations of." Webster's Ninth New Collegiate Dictionary 1232 (1984). The word "interfere" is defined as "to interpose in a way that hinders or impedes." Webster's Ninth New Collegiate Dictionary 631 (1984).

Therefore, if the purpose of advice given to a witness is to hinder the State's one complete opportunity to investigation or prosecute a claim, it is intimidation of a witness. If the advice is given in good faith based on what is perceived to be the best interests of the witness, it is not intimidation of a witness. The simple, ordinary definitions of the words in the statute are clear enough and not so vague as to leave ordinary people guessing as to whether they have subjected themselves to criminal liability.

*Jury Instructions*

Finally, Wilkins argues that the district court erred by denying her request for an instruction defining the phrase "thwart or interfere in any manner with the orderly administration of justice." Whether the refusal to give the requested definitional instruction was error is a legal question subject to unlimited review. See *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"[O]ur appellate courts have repeatedly advised district judges to use PIK language, absent particular facts requiring modification." *State v. Dickson*, 275 Kan. 683, 685, 69 P.3d 549 (2003). Not every difficult term requires definition as jurors are "expected to decipher many difficult phrases without receiving specific definitions." *State v. Robinson*, 261 Kan. 865, 877, 934 P.2d 38 (1997). Moreover, when words or phrases are easily comprehended by individuals of common intelligence, they do not require a defining instruction. See *State v. Roberts-Reid*, 238 Kan. 788, 789, 714 P.2d 971 (1986). Finally, words only require definition when the instructions would otherwise mislead the jury or cause jurors to speculate. See *State v. Phelps*, 28 Kan. App. 2d 690, 695, 20 P.3d 731, *rev. denied* 271 Kan. 1041 (2001).

The district court used the standard PIK instructions for the crime alleged which instructs the jury that one of the elements that must be proved beyond a reasonable doubt is that the "act was done with the intent to thwart or interfere in any manner with the orderly administration of justice." PIK Crim. 4th 59.060. The PIK instruction explicitly follows the language of the statute and, as discussed above, the language of the statute is neither vague nor ambiguous. The district court did not err when it declined to give

an additional instruction defining the phrase "thwart or interfere in any manner with the orderly administration of justice" because jurors can be expected to understand its common meaning without resorting to speculation.

Affirmed.

\* \* \*

BUSER, J., dissenting: I dissent from the majority opinion for two reasons. First, having carefully reviewed the record, I find insufficient evidence to prove beyond a reasonable doubt that Breonna Wilkins attempted to dissuade F.W. from testifying in court, a key element to the crime of aggravated intimidation of a witness. Second, I find insufficient evidence to prove beyond a reasonable doubt that Wilkins had a specific intent to thwart or interfere with the orderly administration of justice, another critical element to the crime of conviction.

Wilkins was convicted of aggravated intimidation of a witness in violation of K.S.A. 2011 Supp. 21-5909. Following the language of the statute, the jury was instructed, in relevant part, to decide whether Wilkins "attempted to dissuade, [F.W.], *a witness, from attending or giving testimony* at any proceeding or inquiry authorized by law." (Emphasis added.) The jury was also instructed, consonant with the statutory language, to decide whether "[t]his act was done with the intent to thwart or interfere in any manner with the orderly administration of justice." On appeal, Wilkins asks us to consider the sufficiency of the evidence for both elements.

With regard to the first element at issue, the gravamen of this crime is the persuading of a witness not to testify in a court proceeding. The plain language of the statute does not prohibit an individual from discouraging a codefendant or any other person from engaging in plea bargaining or entering a guilty plea pursuant to a plea agreement. F.W. testified that Z.A. never mentioned the words, "testify" or "witness." According to F.W., the message conveyed was simply, " '[D]on't take the deal, the case is weak.' "

My colleagues circumvent the fact that Z.A. never discouraged F.W. from providing courtroom testimony. They do this by mistakenly equating Z.A.'s attempt to persuade F.W. not to enter into

a plea agreement with an attempt to discourage courtroom testimony. The State took the same tack at trial, arguing to the jury, "Plea, is a euphemism here for appearing and testifying."

But the State presented insufficient evidence that Wilkins, Z.A., or F.W. equated dissuading F.W. from entering into a plea agreement with persuading her not to testify in court. And it is not apparent that such a correlation would be made by a reasonable person. See *State v. Phelps*, 266 Kan. 185, 195, 967 P.2d 304 (1998) (applying "the reasonable person test" to aggravated intimidation of a witness). Although there was evidence that F.W. believed that any plea agreement would include testifying for the State, in my opinion the evidence did not show—let alone prove beyond a reasonable doubt—that Wilkins understood this or intended to dissuade F.W. from performing the testimonial aspect of any plea agreement.

Finally, neither the majority nor the State cites any on-point legal precedent where dissuading a defendant from entering into a plea agreement or pleading guilty was equated with dissuading the defendant from testifying in court, and, as a consequence, being convicted of intimidation of a witness.

Turning to the second element of the crime—which requires an intent to thwart or interfere in any manner with the orderly administration of justice—the evidence was also insufficient. Given the plain wording of K.S.A. 2011 Supp. 21-5909(a)(1), the State had to prove that Wilkins acted with a specific intent: a "conscious objective or desire" to thwart or interfere with the orderly administration of justice. K.S.A. 2011 Supp. 21-5202(h).

The district court hearing at issue was the preliminary examination for four adults charged with the murder of Natalie Gibson and the shooting of Lori Allison. The State asked F.W., the juvenile lookout during the crimes, to testify at the preliminary examination in exchange for an agreement to "stay in juvenile court." F.W. declined the State's offer at this early stage of the prosecution.

In the present case, the prosecutor argued at trial that Wilkins intended "to keep [F.W.] quiet by not agreeing with the State and enter into a deal, . . . so that [Wilkins] could protect [the four adults] that were having this preliminary hearing." Yet, I could not

find any relevant evidence—let alone proof beyond a reasonable doubt—that Wilkins believed the preliminary examination was of such significance or that F.W.'s refusal to testify could "protect" those defendants in that particular proceeding. Moreover, despite F.W.'s refusal to cooperate, plead, or testify for the State, the orderly administration of justice was not impacted by Wilkins' indirect communications with F.W. Indeed, the prosecution was successful in presenting witnesses at the preliminary hearing, not including F.W., which resulted in the four adult defendants being bound over for trial.

The majority finds sufficient evidence to conclude that Wilkins intended to interfere with the "protected plea bargaining process, which itself was part and parcel of the State's one complete opportunity to convict Wakes and the other codefendants, all of which furthered the public's interest in the orderly administration of justice in this case." 50 Kan. App. 2d at 1125. I disagree.

First, Wilkins was not charged with having the intent to interfere with the orderly administration of justice by dissuading F.W. from making a plea agreement. Wilkins was charged with having the intent to interfere with the orderly administration of justice by dissuading a witness from providing courtroom testimony. ·

Second, the majority incorrectly blends legal precedents not pertinent to the crime of aggravated intimidation of a witness to justify its legal conclusion that because Wilkins attempted to dissuade F.W. from making a plea agreement, she intended to thwart or interfere with the orderly administration of justice.

The legal precedents cited by the majority in support of its contention have never been applied in the context of the crime of aggravated intimidation of a witness. The majority states: *"In other contexts,* the United States Supreme Court has recognized 'society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.' *Arizona v. Washington,* 434 U.S. 497, 509, 98.S. Ct. 824, 54 L. Ed. 2d 717 (1978)." (Emphasis added.) Slip op. at 6-7. As tacitly acknowledged by my colleagues, our court and the Kansas Supreme Court have relied on *Arizona v. Washington,* 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978), but always in the context of mistrials and double

jeopardy, and never in the analysis of the crime of aggravated intimidation of a witness. See, *e.g.*, *State v. Johnson*, 261 Kan. 496, 504, 932 P.2d 380 (1997); *State v. Bates*, 226 Kan. 277, 286, 597 P.2d 646 (1979); *State v. Gonzalez*, 25 Kan. App. 2d 862, 867, 973 P.2d 208 (1999).

Next, the majority cites *State v. Byrd*, 203 Kan. 45, 51, 453 P.2d 22 (1969), for the proposition that plea discussions and agreements "between an attorney for an accused and a prosecuting attorney are consistent with the fair and effective administration of justice." Once again, this precedent is inapplicable to the crime of conviction or the facts of this case. *Byrd* was an appeal of a district court's denial of the defendant's motion to withdraw pleas. The "one primary question" presented to our Supreme Court on appeal was: "Were the guilty pleas involuntary because of plea discussions leading to a plea agreement?" 203 Kan. at 46.

Combining these two disparate precedents, my colleagues determine:

"A rational factfinder could have concluded from the evidence that Wilkins intended to interfere with this protected plea bargaining process, which itself was part and parcel of the State's one complete opportunity to convict Wakes and the other codefendants, all of which furthered the public's interest in the orderly administration of justice in this case." 50 Kan. App. 2d at 1125.

Not only is the majority's judgment based on a hybrid legal precedent unrelated to the crime on appeal, the breadth of its conclusion is concerning. Broadly interpreted, not only might communications with a defendant regarding a guilty plea provide evidence of intimidating a witness, but the defendant's failure to promptly cooperate with the State may also provide such evidence. Of greater significance, there are also worrisome implications regarding an individual's constitutional protections such as the freedom of speech and the right to remain silent, that are beyond the scope of this dissent.

In sum, the majority's mistaken mixing of two separate legal precedents not pertinent to the crime of aggravated intimidation of a witness does not and should not provide the legal support for the majority's incorrect judgment that there was sufficient evidence

that Wilkins was guilty of aggravated intimidation of a witness beyond a reasonable doubt.

For all of the reasons stated, I would reverse the conviction. Given this conclusion, I would not address the other two issues raised by Wilkins on appeal.