NOT DESIGNATED FOR PUBLICATION

No. 113,059

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LEIGH FOSTER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed January 29, 2016. Affirmed.

*Sam S. Kepfield*, of Hutchinson, for appellant.

*Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., SCHROEDER, J., and HEBERT, S.J.

ATCHESON, J.: Defendant Leigh Foster challenges the sufficiency of the evidence a Reno County District Court jury relied on to convict her of two counts of aggravated intimidation of witnesses. Given the deferential standard of review afforded the State as the prevailing party at trial, we affirm the convictions.

The charges arose from a somewhat involved intrafamilial dispute centering on the treatment of B.R.A.F. Leigh and her husband Jerome adopted B.R.A.F. as a young child. B.R.A.F. apparently neglected his school work, leading to failing grades. Leigh and Jerome viewed B.R.A.F.'s poor academic performance as the product of his

1

unwillingness to apply himself rather than some innate inability to do the work. B.R.A.F. may have had some minor behavioral problems, as well. In 2009, the family moved to Arlington in Reno County, at least in part to afford B.R.A.F. a fresh start in a new school system.

In early November 2010, when B.R.A.F. was about 14 years old, Leigh and Jerome learned that he was failing two courses at school. They forbade B.R.A.F. from participating in any sports until his grades improved. That apparently increased the friction in the home. During that time, Michael Rinebold, a cousin of the Fosters, also lived with them. Latosha Schlumbohm, Leigh's daughter from a previous marriage, and her husband lived in the vicinity and had resided with the Fosters from early 2008 until August 2010.

On November 15, the Kansas Department of Social and Rehabilitative Services received a report that Leigh and Jerome had abused B.R.A.F. Two days later, an SRS investigator interviewed B.R.A.F. at school. He told the investigator that during an argument, Leigh had hit him with a baseball bat and that Jerome had used a stun gun to discipline him several times. B.R.A.F. repeated those statements to a Reno County Sheriff's deputy. The SRS investigator initiated proceedings to remove B.R.A.F. from the household, and he wound up living with his maternal grandmother.

In the meantime, Schlumbohm contacted the sheriff's deputy and confirmed that Jerome had used a stun gun to shock B.R.A.F. on November 14. Schlumbohm had made a video recording of the incident with her cell phone. The deputy secured a copy of the recording.

Following the sheriff deputy's investigation, the State filed felony child abuse charges against Leigh and Jerome. The district court held a preliminary hearing on those

2

charges on March 31, 2011. Both B.R.A.F. and Schlumbohm testified at the preliminary hearing.

On April 22, Schlumbohm received a certified letter from Leigh demanding that she and her husband immediately pay the Fosters $15,000 for rent and other expenses they owed from the time they had resided with the Fosters. The letter threatened legal action if the debt remained unsatisfied. Schlumbohm turned the letter over to the sheriff's deputy, believing it to be an attempt to intimidate her and her husband and to dissuade them from further participation in the criminal case against the Fosters.

Also the evening of April 22, Rinebold walked up to B.R.A.F. at a public basketball court and spoke to him about the criminal case and the Fosters' desire to make amends with him. About a month later, B.R.A.F.'s grandmother reported the interaction between Rinebold and B.R.A.F. to the Reno County District Attorney's Office and was put in touch with the sheriff's deputy.

Based on those events, the State charged Jerome with one count of aggravated intimidation of a witness, a severity level 6 person felony, in violation of K.S.A. 21-3833, and Leigh with two counts of aggravated intimidation of a witness. All of the child abuse and witness tampering charges against both Jerome and Leigh were consolidated for a single trial.

The jury heard testimony over 2 days in April 2012. At trial, Schlumbohm and her husband testified they had agreed they would owe a set amount for monthly rent and would reimburse some household expenses for the time they lived with the Fosters. But Schlumbohms understood they would not have to begin paying on that obligation until they became financially able to do so. They testified that they had never discussed with the Fosters when any repayment might be due. They told the jurors they were shocked by both the timing of the demand letter and the claim for a single payment of $15,000. The

3

undisputed evidence showed they could not make a payment of that size. During his testimony, Jerome said he had worked with Leigh in drafting the demand letter but denied any improper purpose in doing so.

At trial, B.R.A.F. testified that Rinebold approached him as Jerome was riding around the block on his motorcycle. According to B.R.A.F., Rinebold told him he could come home, have friends over, compete in sports, and wouldn't have to do any chores if the criminal case were dropped. B.R.A.F. told the jurors that Rinebold "tried to talk me out of testifying in court." He also testified Rinebold encouraged him to say he made everything up so he could come home. The sheriff's deputy testified that when B.R.A.F. told him about the encounter, B.R.A.F. recounted that Rinebold had said the Fosters were worried about having criminal records and the whole matter was a big misunderstanding. Rinebold testified as a defense witness. He told the jurors he acted entirely on his own in speaking with B.R.A.F. and made no promises of any kind to B.R.A.F. According to Rinebold, B.R.A.F. said he was tired of going to court. Rinebold testified that in response he simply suggested that B.R.A.F. should drop the case, so he could come home. Rinebold, however, admitted that he met with Jerome and Leigh just before approaching B.R.A.F. because he wanted to know if a no-contact order the district court entered prohibited him from speaking with B.R.A.F.

The jury convicted Jerome and Leigh of the charges for aggravated intimidation of witnesses but could not agree on a verdict on the charges for child abuse. The State later amended the abuse charges to misdemeanors for domestic battery to which Jerome and Leigh agreed to plead no contest.

At sentencing, the district court sentenced Leigh to a controlling prison term of 18 months and placed her on probation for 24 months. Jerome and Leigh filed separate appeals. Because of procedural issues with Leigh's appeal, it has lagged behind Jerome's. Another panel of this court affirmed Jerome's conviction for aggravated intimidation of a

witness. See *State v. Foster*, No. 108,323, 2013 WL 5870041 (Kan. App. 2013) (unpublished opinion), *rev. denied* 300 Kan. ___ (August 14, 2014). Leigh has successfully completed her probation. Her appeal, however, continues to present a justiciable controversy because of the collateral effects attendant to felony convictions.

For her only points on appeal, Leigh says her convictions for intimidating B.R.A.F. and Schlumbohm lacked adequate factual bases in the evidence. In reviewing a sufficiency challenge, we construe the evidence in a light most favorable to the party prevailing below, here the State, and in support of the jury's verdict. When measuring sufficiency, an appellate court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). The issue for review is simply whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). Convictions, even of the most serious crimes, may be based on circumstantial evidence. *State v. Longoria*, 301 Kan. 489, 533, 343 P.3d 1128 (2015).

Under the statutes in effect at the time, intimidation of a witness entailed "knowingly and maliciously preventing or dissuading, or attempting to prevent or dissuade . . . [a]ny witness or victim from attending or giving testimony at any civil or criminal trial, proceeding or inquiry authorized by law." K.S.A. 21-3832. The crime was treated as "aggravated" if one or more additional conditions were met. K.S.A. 21-3833. Pertinent here, the act of intimidation or dissuasion would be considered aggravated if it were undertaken "in furtherance of a conspiracy" or were directed at a witness or victim less than 18 years old. K.S.A. 21-3833(a)(2), (a)(4). To violate those statutes, a defendant must have had the intent to harm or injure another person or to thwart or interfere in any manner with the administration of justice. *State v. Moody*, 35 Kan. App. 2d 547, 555, 132 P.3d 985, *rev. denied* 282 Kan. 794 (2006). Criminal intent, as a state of mind, is seldom

5

established through direct evidence and may be inferred from the circumstances. See *State v. Dixon*, 289 Kan. 46, 65, 209 P.3d 675 (2009).

Although we refer to the crime with the shorthand phrase "intimidation of a witness," the statutes actually were broader—any means of dissuading a witness or victim violated K.S.A. 21-3832 and K.S.A. 21-3833. Intimidation, of course, trades on threats or coercion. But a promise of material benefits could just as easily dissuade a witness or victim from participating in a criminal case. And such a promise would be just as unlawful under K.S.A. 21-3832 and K.S.A. 21-3833. To prove a violation, the State had to show that the means used would have dissuaded a reasonable person in the same situation as the witness or victim. *State v. Phelps*, 266 Kan. 185, 195, 967 P.2d 304 (1998).

The demand letter Leigh sent to Schlumbohm reasonably could be viewed as intimidating or coercive. The Schlumbohms were in no financial position to make an immediate payment of $15,000. The jury could readily infer Leigh was well aware of their limited financial resources. The letter, of course, was plainly directed at a key witness in the case against the Fosters. The timing of the letter would fairly allow the jury to conclude the threat from Leigh to collect the debt was tied to the criminal case—the implication being if Schlumbohm were to cease cooperating with the prosecution, the collection efforts would not go forward or the debt might be forgiven entirely. The letter was delivered about 3 weeks after Schlumbohm gave damaging testimony at the preliminary hearing. (The precise date was subject to conflicting evidence at trial, but we accept the time closer to the preliminary hearing, consistent with the governing standard of review.)

To that point, the Fosters had made no effort to formalize the full amount the Schlumbohms owed, let alone a timetable for repayment or a demand they begin paying. Although the Schlumbohms had acknowledged an obligation to compensate the Fosters,

that's about as far as the matter of the debt had progressed. The jury, then, reasonably could see the demand letter as an abrupt and threatening communication entirely contrary to how the obligation had been treated until then. In turn, the jury could also conclude Schlumbohm's testimony at the preliminary hearing prompted the letter.

That much of the evidence supported the elements of intimidation of a witness, consistent with K.S.A. 21-2832. The evidence also established a requisite aggravating factor to enhance the crime under K.S.A. 21-2833. Jerome testified that he helped Leigh draft the letter, thereby establishing concerted conduct on their part. Their joint effort supports a jury finding of a conspiracy or agreement to intimidate Schlumbohm. In that respect, the jury was free to disbelieve Jerome's testimony that he helped craft the letter only to collect a debt and for no other purpose. See *State v. Franco*, 49 Kan. 924, 930, 319 P.3d 551 (2014) ("jurors may choose to believe parts of a given witness' account of relevant events and disbelieve other parts"), *rev. denied* 301 Kan. ___ (2015).

There was sufficient evidence to support Leigh's conviction for aggravated intimidation of Schlumbohm as a witness.

We turn to Leigh's conviction for aggravated intimidation of B.R.A.F., as the victim identified in the child abuse charges. Again, the timing is significant in that Rinebold sought out and communicated with B.R.A.F. 3 weeks after the preliminary hearing. Rinebold explained to B.R.A.F. that he would have considerably greater privileges if he came home—no chores, freedom to play sports, and seemingly unlimited access to his friends. But B.R.A.F. couldn't come home with the criminal charges pending against his parents. Rinebold suggested that a change in testimony or a refusal to cooperate further might accomplish that objective. The promise of those benefits satisfied the requirement of K.S.A. 21-3832 that action be taken in an effort to knowingly dissuade a witness or victim from participating in a criminal prosecution. As we have explained, the unlawful action need not be coercive and, rather, may be a beneficial inducement.

7

A jury could infer Jerome's involvement, in part, from his close physical presence, riding around the block on his motorcycle, as Rinebold and B.R.A.F. spoke. In addition, the nature of the inducement effectively required the consent of both Jerome and Leigh. What Rinebold conveyed to B.R.A.F. was a promise of greater freedom at home, something that was not within his purview to grant or control. Jerome and Leigh had that authority. The jury, therefore, could reasonably infer Jerome and Leigh acted through Rinebold as their emissary in communicating with B.R.A.F.

Rinebold offered the jury an account of the conversation that flatly contradicted B.R.A.F.'s testimony. The jury could fairly discount Rinebold's version as lacking credibility. A jury has nearly unlimited discretion in resolving that kind of credibility conflict. And we, as appellate judges, cannot and do not second-guess those determinations. *Franco*, 49 Kan. App. 2d at 936-37.

The evidence on this charge also supports two aggravating factors. The communication necessarily required coordination between Rinebold and Leigh, so that the promised benefit would carry some meaning for B.R.A.F. That inferentially established a conspiracy. In addition, of course, B.R.A.F. was indisputably less than 18 years old, establishing a second, independent aggravating factor. Either factor alone was legally sufficient to support the conviction for aggravated intimidation of a witness.

There was sufficient evidence to support Leigh's conviction for aggravated intimidation of B.R.A.F. as a victim.

Affirmed.

8